# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF INDIANA,

AT INDIANAPOLIS, MAY TERM, 1883, IN THE SIXTY-SEVENTH
YEAR OF THE STATE.

---

No. 7677.

BOYCE ET AL. *v.* MURPHY ET AL.

STATUTE OF FRAUDS.—*Agreement.*—*Parol Joint Contract for Benefit of One.*— *Principal and Surety.*—A., who was a retail dealer, with B., his friend, agreed, by parol, with a wholesale dealer, for the purchase of goods for A. on credit, to be charged to A. and B. jointly.

*Held,* that the agreement of B. was original and not collateral, and was not within the statute of frauds.

From the Henry Circuit Court.

*J. N. Templer, R. S. Gregory, M. E. Forkner, T. J. Blount* and *C. B. Templer,* for appellants.

*W. March, W. Brotherton* and *L. Newberger,* for appellees.

NIBLACK, C. J.—Action by John W. Murphy, William W. Johnston and William J. Holliday, partners doing business under the name of Murphy, Johnston & Co., against Arthur N. Galbraith and James Boyce, on an account, for goods sold and delivered.

The suit was commenced in the Delaware Circuit Court, but the venue was afterward changed to the Henry Circuit Court.

Galbraith answered, setting up an adjudication, and his discharge as a bankrupt.

Boyce answered: *First.* In denial; *Second.* Payment by Galbraith; *Third.* Payment by Galbraith's assignee in bankruptcy. Issue; trial by jury; verdict in favor of Galbraith, but against Boyce for $629.39.

The general verdict was accompanied by answers to numerous interrogatories submitted to the jury at the request of the parties respectively, all of which either supported or were not inconsistent with it. Motion for new trial by Boyce; remittitur by the plaintiffs for $73.37; motion thereupon overruled, and judgment against Boyce for $556.02.

Error is assigned only upon the refusal of the court to grant a new trial.

From the evidence introduced by the plaintiffs, supplemented by uncontradicted testimony offered by the defendants, the following may be given as a summary of the leading facts brought out at the trial:

The plaintiffs were wholesale dry goods merchants in the city of Indianapolis, and Galbraith was a retail merchant doing business at Muncie, in this State, upon limited means and credit. Boyce was a manufacturer of flax bagging at Muncie, and a man of considerable property and good credit; being a friend and neighbor, Boyce consented to accompany Galbraith to Indianapolis on the 15th day of March, 1876, to assist him in purchasing some goods he needed in his business, and went with him to the plaintiffs' place of business. Boyce there explained to Murphy, one of the plaintiffs, the object he had in view in accompanying Galbraith on the occasion. Murphy enquired how much goods they wished to buy. Galbraith answered about $1,500 worth. Murphy replied that as Galbraith was close to market he would advise him not to buy so much at a time, but to replenish more frequently. Boyce and Galbraith both acquiesced in that suggestion. Murphy then further enquired of Boyce how he desired to assist Galbraith. Boyce answered, "In any way that would be satis-

factory to the house." Murphy told Boyce that his simply saying that he would pay Galbraith's bills would not hold good in law; that there were two ways in which the proffered assistance might be rendered; one was to make a note for the amount he was willing to be liable for and have it carried to Galbraith's credit; the other way was that he might consent to have the goods charged to both him and Galbraith. In response to this explanation, Boyce repeated that any arrangement which would be satisfactory to the house would be also satisfactory to him; Boyce, continuing, said he did not want it known in Muncie that he was in any way interested in the business. Murphy told him they could mark the boxes and bill the goods to Galbraith alone, and in that way accomplish his desire in that respect. Boyce stated that he had confidence in Galbraith and intended to see him through; that he did not intend to engage in the business, but might give it some supervision.

At that point in the negotiation Murphy called a salesman and introduced him to Boyce and Galbraith, whereupon the salesman and they went out together to the sales rooms, where Galbraith devoted himself to the selection of the goods he ordered that day, and from which Boyce passed out of the building taking no part thereafter in the matter of purchasing goods for Galbraith. After Boyce and Galbraith left the counting-room, Murphy told the book-keeper and cashier of the firm to charge whatever goods might be ordered for Galbraith to Boyce and Galbraith jointly. Galbraith bought goods that day amounting to $490.49, which were billed and shipped to him, but were charged to him and Boyce jointly on the books of the plaintiffs. Galbraith purchased other bills of goods from time to time which were billed, shipped and charged in the same way. The last of these bills was made on the 28th day of September, 1876, and all in the aggregate, including the one filled on the 15th day of March, 1876, amounted to $2,558.30. Galbraith also made payments at different times aggregating $870.61.

No statement of the account made by Galbraith was ever sent to Boyce, nor was any demand of payment made on him, nor did he know that the account or any part of it was charged to him, nor that the plaintiff looked to him for payment, until this action was commenced, nor did Boyce have a pecuniary interest of any kind in Galbraith's business. Soon after the 28th day of September, 1876, the plaintiffs sent one of their clerks up to Muncie to see Galbraith, and to endeavor to collect of him the balance due upon the account. The clerk offered to take Galbraith's note for the balance if Boyce would endorse it, but Boyce declined.

This action was begun early in November, 1876, and in a few days thereafter Galbraith went into bankruptcy. The account in suit was afterwards proven against Galbraith's estate in bankruptcy, and before this cause was finally tried the plaintiffs received from the assignee in full of their dividend the sum of $73.37.

The court instructed the jury upon its own motion as follows:

"No. 5*a*. If the plaintiffs refused to sell goods to Galbraith, or to furnish him goods and look to Boyce for payment in the event that Galbraith did not pay, and informed Boyce that such an undertaking would not bind him, but offered to and did furnish Galbraith goods, upon an agreement with Boyce that they would look to him (Boyce) primarily, and in the first instance, jointly with Galbraith, and would give the credit to both defendants, and charge the goods jointly to them upon plaintiffs' books, then Boyce would be jointly liable with Galbraith to the plaintiffs for such goods so furnished, and this, although the goods were for the sole use of Galbraith, and Boyce had no interest therein or title thereto as between Galbraith and himself."

"No. 6*a*. If the jury believe, from the evidence, that in March, 1876, the defendants together visited the plaintiffs' place of business in Indianapolis, and it was there understood and agreed between them that the plaintiffs would sell to the

defendants jointly goods to the value of $1,500, or any other sum, to be billed and shipped to Galbraith at Muncie, a portion to be selected at the time and portions afterwards, as they were wanted by Galbraith, and to be charged to both defendants, and if the jury further believe from the evidence that all or any portion of the goods sued for were procured from the plaintiffs under such arrangement, both defendants would be liable to the plaintiffs for all such goods, without any agreement in writing, and in such case it would not be necessary for Boyce to be present or take any part in the purchase of the goods, or have any interest in them after they were purchased."

It is earnestly maintained by the appellant that these instructions did not state the law correctly as applicable to the facts of this case; that it is the substance of a transaction which must be considered in determining whether a promise in a given case is within the statute of frauds; that the fair inference from all the facts was that the goods were sold to Galbraith as principal, and to the appellant as his surety, and that from the very nature of the transaction the undertaking of the appellant was collateral and contingent only, and hence within the statute requiring such undertakings to be in writing; that an agreement by a promisor that goods sold to a third person shall be charged to him and such third person jointly, does not, in fact, make such promisor anything more than a mere surety for the payment of the value of the goods; that the true rule is, that one person can not be held primarily liable for a debt created by another, so long as the person creating the debt remains, to any extent, liable for its payment, citing authorities seemingly in support of that doctrine. The rule contended for is the recognized rule in all cases in which the debt has been created by some third person before the promisor agrees to pay it, but this rule evidently does not go to the extent to which the appellant seeks to carry it.

Browne on the Statute of Frauds, after enumerating sev-

eral classes of cases in which the promise to pay the debt of another must be in writing, concludes: "If, however, the credit is given to both jointly, as neither can be said to be surety for the other to the creditor, their engagement need not be in writing." Section 197.

Brandt on Suretyship, at the close of section 62, also says that "when credit is given to two jointly, and they are both principals, the statute does not apply to their engagement."

The conclusion reached by these authors has the support of many well considered cases in several of the States, and appears to us to be deducible from the language of the statute itself, which, as to cases like this, is to the effect that no action shall be brought "To charge any person, upon any special promise, to answer for the debt, default, or miscarriage of another. * * Unless the promise, * * or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized. 1 R. S. 1876, p. 503 ; R. S. 1881, sec. 4904.

The inhibition of the statute is, as a careful reading of it will make apparent, only against verbal promises to answer for the debt of *another*, that is, for a debt or obligation which another has incurred, and not against debts created, in whole or in part, by the promisor himself for the benefit of another. In other words, the statute obviously applies only to promises which are in the nature of guaranties for some original or primary obligation, resting upon, and to be performed by, another, and which are usually denominated collateral undertakings. If there be no original or already existing liability on the part of another, there is nothing to which a merely collateral promise can attach, and hence any promise which results, or materially aids, in the creation of a new liability jointly with another, is necessarily an original promise, and not within the statute.

Browne and Brandt both cite the case of *Gibbs* v. *Blanchard,* 15 Mich. 292, as sustaining the doctrine respectively announced by them. That case may be regarded as a leading

case upon that phase of the statute of frauds to which it has an application. In that case, the facts were that Gibbs and one Daily called on Blanchard together. Gibbs asked Blanchard if he wanted to sell his mare, to which Blanchard replied in the affirmative. Gibbs, enquiring the price, and being told sixty dollars, wanted to know if Blanchard would take Daily's note if he, Gibbs, would also sign it and see it paid. To this Blanchard assented. The mare was not present, and Gibbs, being anxious to leave immediately for home, said that Daily might go with Blanchard and see the mare, and if she suited him he might bring her back with him, and sign a note for the price of the mare, and that the first time he, Gibbs, came to town he would also sign it. This arrangement resulted in the delivery of the mare to Daily, and in his signing a note for the agreed price payable at six months from date. Gibbs afterwards endorsed this note, but did so on Sunday, and his endorsement was, in consequence, admitted to be void. Blanchard, after waiting more than six months, brought suit against Daily and Gibbs jointly for goods sold and delivered. The note was produced at the trial and tendered back to the defendants. There was a verdict and judgment against both Daily and Gibbs.

The court in that case charged the jury that "if it was the understanding of the parties that Daily was the purchaser, and that he should give his note to the plaintiff for the price, and that Gibbs should so sign as only to be liable as endorser, the plaintiff must fail. If, however, the understanding of the parties was, at the time, that Gibbs and Daily were the buyers of the mare, and that both were to be liable as purchasers for the purchase price, and, accordingly, should become joint makers of a promissory note for its payment, though Daily was less relied upon by the plaintiff than Gibbs, and though, in point of fact, it was understood that the mare, when bought, should belong to Daily, the plaintiff is entitled to recover. That the principle in this class of cases is, that if the agreement be such that two persons, in the purchase of goods, do

at the same time become co-debtors to the seller for the price, then both are purchasers, and the case is not within the statute of frauds, and no memorandum in writing is necessary. But if it be such that one, at the time, becomes debtor to the seller, and the other security only for the debt, it is within the statute of frauds, and the undertaking of the security is void unless a memorandum of it in writing is made."

Upon an appeal, the Supreme Court of Michigan, in the light of numerous authorities cited, distinguished and commented upon, in its review of the case, expressed the opinion, Judge CHRISTIANCY speaking for the court, that this charge was not only correct, but stated the law applicable to the evidence in the cause with remarkable clearness. That court, continuing further, said, that " The statute only applies to such promises made in behalf or for the benefit of another, as would, if valid, create a distinct and *several* liability of the party thus promising, and not a joint liability with the party in whose behalf it is made." All the judges present, including Judges COOLEY and CAMPBELL, concurred in affirming the judgment.

Other cases may be cited as according with this Michigan case. *Wainwright* v. *Straw,* 15 Vt. 215 ; *Hetfield* v. *Dow,* 27 N. J. L. 440 ; *Eddy* v. *Davidson,* 42 Vt. 56 ; *Downey* v. *Hinchman,* 25 Ind. 453 ; *Pettit* v. *Braden,* 55 Ind. 201.

A different doctrine, as to purchases made jointly, may be deduced from some other authors and cases, but these other authors and cases appear to us to be in the respect indicated against the weight of authority, and not in complete harmony with the statute of frauds. In this connection see Iglehart's Treatise on Justices of the Peace, 455 ; Baylies Sureties, 77 ; *Swift* v. *Pierce,* 13 Allen, 136 ; *Matthews* v. *Milton,* 4 Yerger, 575.

An examination, however, of the facts of each particular case brought to our attention, and of the questions actually presented for decision in each, makes it obvious that the seemingly conflicting conclusions arrived at, in many of these cases, are much more apparent than real.

In the case in hearing, the jury, in answer to one of the interrogatories submitted to them, found that the appellant agreed to become joint purchaser with Galbraith of goods to be delivered to the latter to the extent and of the value of $1,500, and that goods to that extent and value were sold to the appellant and Galbraith jointly.

There was evidence, deducible from practically admitted facts, tending to sustain this special finding of the jury, which was in harmony with, and in support of, the general verdict, and which made this case a parallel one in most material respects with the case of *Gibbs* v. *Blanchard, supra.*

The appellant has, consequently, no reason to complain of the instructions given as above by the circuit court upon its own motion.

Questions are made upon some instructions asked by the appellant and refused by the circuit court, but what we have said amounts to a practical decision of every material question presented in this cause.

The judgment is affirmed, with costs.

