DAVENPORT ET AL., respondents, *v.* KLEINSCHMIDT ET AL., appellants.

MUNICIPAL CORPORATIONS — *City ordinance attempting to create a monopoly.* — The grant by a city council of the exclusive right of selling to the city all the water required by it for sewerage and fire purposes for the period of twenty years, at a minimum rate fixed in the contract, is a monopoly, and this though the grant does not prevent other people from selling water to private citizens.

SAME — *City cannot create a monopoly.* — A city council has no authority to grant to any person a monopoly, even where no express prohibition is found in the charter or other acts of the legislature.

SAME — *City taxation — Right of tax payers.* — Any tax payer, on behalf of himself and others, has the right to institute proceedings in a court of equity to prevent the misapplication of public funds by municipal officers, on the ground that the threatened illegal corporate act will increase the burden of taxation and thus burden the plaintiffs.

APPEAL — *Party not appealing.* — Where a suit for an injunction is brought against A. and B., but the summons is not served upon B., nor does he appear, and a writ of injunction is granted against the defendants, but not served upon B., and A. moves for a dissolution, in which motion B. takes no part, nor appeals from the order denying the motion, he is not before the court on an appeal by A. from such order.

MUNICIPAL CORPORATION — *Fiscal management — City charter Helena, Montana.* — Montana act of 1883, amending the charter of the city of Helena, limits the power of the city council "to incur any indebtedness on behalf of said city for any purpose whatever to exceed the sum of $20,000." *Held*, that a contract which binds the city to take water from the contractor at an annual rent of $15,000, where the

bonded indebtedness of the city is $19,500 and the floating indebtedness over $15,000, is in violation of the charter, as such a contract creates indebtedness within the meaning of such amending act.

SAME — *Ordinance unreasonable.* — In proceedings for an injunction to restrain a city council from carrying out a contract, it appeared the city had a population of ten thousand and an assessment valuation of $5,000,000; that it was chartered five years previously; that its bonded indebtedness was $19,500; that its floating debt was $15,000; that four per cent. of its taxable property would amount to $200,000; that the taxing power, if exerted to the limit allowed by the charter, would be $15,000 per annum. *Held,* that an ordinance confirming a contract by which the city bound itself for the period of twenty years to take all the water it required for fire and sewerage purposes from the contractor at a rent of $15,000 a year for the first one hundred and fifty hydrants, with obligations to erect more hydrants as the mains were extended, was unreasonable and *ultra vires.*

SAME — *Public act No. 159, forty-ninth congress, first session, limiting indebtedness in territories.* — A contract by which a city whose assessment valuation is $5,000,000 agrees to pay $15,000 a year for twenty years cannot be considered as falling within public act No. 159, forty-ninth congress, first session, prohibiting municipal corporations in the territories becoming indebted to an amount exceeding four per cent. of the valuation.

SAME — *City ordinance — Violation of city charter of Helena, Montana.* — An ordinance or contract by the city council of Helena, agreeing to take water from the contractor for twenty years, which is made without previously advertising for bids, is void as being in contravention of the city charter, which requires that all contracts over $100 shall be advertised for bids.

SAME — *Injunction restraining city council from incurring indebtedness.* — Where a city has already reached the limit of indebtedness permitted by its charter, and its council has passed an ordinance confirming a contract which may render it liable at any time to the payment of an additional annual sum equal to three-fourths of the limit of its indebtedness as fixed by its charter, and directing that warrants shall be issued to pay such sum monthly when the terms of the contract are fulfilled, an injunction restraining the city council from carrying out the contract cannot be considered as improvidently or prematurely issued.

BACH, J., dissenting.

*Appeal from District Court, Lewis and Clarke County.*

A. C. BOTKIN, City Attorney, and CARTER & CLAYBERG, for the appellants.

I. The charter of the city of Helena gives to the city council power:

*a.* "To make regulations to secure the general health of the inhabitants." Page 8, sec. 7.

*b.* "To provide the city with water, erect hydrants and pumps, build cisterns and dig wells in the streets for the supply of engines and buckets." Page 8, sec. 8.

*c.* "To provide for the prevention and extinguishment of fires." Page 9, sec. 18.

*d.* "To establish and open drains, canals and sewers." Page 26, sec. 9.

*e.* "To make all ordinances which shall be necessary and proper for carrying into execution powers specified in this act." Page 23, sec. 1.

II. It would be impossible for the council to carry into execution the powers to provide the city with water, etc., without making contracts for a term of years; and it follows that the power to do so is vested in the council. Dillon on Municipal Corp. secs. 55, 373, 549; *State ex rel.* v. *Cin., G. L. & C. Co.* 18 Ohio St. 262; *Norwich G. L. Co.* v. *Norwich C. G. Co.* 25 Conn. 19; *Douglass* v. *Mayor Virginia City*, 5 Nev. 148; *City of Williamsport* v. *Commonwealth*, 84 Pa. St. 487; Boone on the Law of Corporations, sec. 289.

III. *a.* The council has a right to authorize the laying of water pipes upon the streets of the city. Dillon on Municipal Corp. sec. 551; Angell on Highways, secs. 25, 312.

*b.* The sections of the ordinance which grant this franchise are quite distinct and easily separable from those which provide for the purchase of water by the city for fire and sewerage purposes. Assuming the latter to be unlawful, the injunction should have been directed against their execution only, and not against the execution of the entire ordinance. *Smith* v. *McCarthy*, 56 Pa. 379; *Amesbury* v. *Bowditch M. L. Ins. Co.* 6 Gray, 596; *Commonwealth* v. *Dow*, 10 Met. 382; *Commonwealth* v. *Hitchings*, 5 Gray, 482; *Rogers* v. *Jones*, 1 Wend. 238.

*c.* The laying of the pipes by Woolston would involve no obligation on the part of the city whatever if the council had no authority to contract with him for the purchase of the water in the manner provided in the ordinance. *McDonald* v. *Mayor*, 68 N. Y. 23; *Wallace* v. *Mayor San Jose*, 29 Cal. 181.

IV. An appropriation of the current revenues of the city for the payment of its ordinary expenses is not an incurring of indebtedness.    *Grant* v. *Davenport*, 36 Ia. 401; *Dively* v. *Cedar Falls*, 27 Ia. 227.

V. The question as to whether this ordinance grants an exclusive right cannot be raised in this action.    *Grant* v. *Davenport, supra;* 10 N. W. Rep. 886.

VI. The ordinance does not constitute a contract within the intent and meaning of the provision of the charter requiring the advertising for proposals.    33 N. Y. 309, and cases there cited; *In re Dugro*, 50 N. Y. 513.

VII. The plaintiffs as tax payers can only maintain this action on the ground that the proceedings contemplated by the ordinance would cause an increase of taxation.    It is not alleged in the complaint that the execution of the ordinance would increase plaintiffs' taxes, and there is no reason to assume that such would be its effect.    *Linden* v. *Case*, 46 Cal. 171; *Thompson* v. *Com'rs Canal Fund*, 2 Abb. Pr. 248; *Brady* v. *Mayor N. Y.* 7 Abb. Pr. 234; Dillon on Municipal Corp. sec. 736, a, 3.

VIII. If it shall be assumed that an increase of taxation would result, the injury to plaintiffs is too remote and contingent to invoke the writ of injunction.    *People* v. *Canal Board*, 55 N. Y. 390; *Bigelow* v. *Hartford Bridge Co.* 14 Conn. 595; 10 N. W. Rep. 886; 102 N. Y. 500; 53 Cal. 201.

IX. This question is to be determined not with reference to the interests of these respondents alone, but with reference to the effect of the ordinance upon the tax payers of the city as a whole; whether it will inure to their detriment or their benefit.    *Fitzpatrick* v. *Flagg*, 5 Abb. Pr. 213.

B. PLATT CARPENTER, SANDERS, CULLEN & SANDERS, E. W. & J. K. TOOLE & WALLACE, and BULLARD & BARBOUR, for the respondents.

I. This action is brought to restrain the defendants from collecting and paying out public moneys in pursuance of a certain ordinance which is made a part of the complaint. It appears from the allegations and the exhibits referred to, that plaintiffs are resident tax payers of the city of Helena, and that a contract has been entered into, by the terms of which the city council will make an illegal disposition of the people's money which is to be met by the taxation of their property. In such case a court of equity will stay the execution of the contract and prevent the illegal expenditure. *Crampton* v. *Zabriskie*, 101 U. S. 601, 604, 609; Pomeroy, Eq. Jur. secs. 258, 260, note 1, 270, 273; *Newmeyer et al.* v. *M. M. R. R.* 52 Mo. 84, 89; *Rice* v. *Smith, County Judge*, 9 Iowa, 576; *Williams et al.* v. *Pungy et al.* 25 Iowa, 436; *The Board, etc.* v. *Clay County et al.* 49 Ind. 100, 103, 104; *Tendt* v. *Town of Sharon*, 34 Conn. 108; *People* v. *Mayor*, 32 Barb. 35; *Christopher* v. *Mayor*, 13 Barb. 567; *Mechan et al.* v. *Sharp*, 15 Barb. 193–244; *Pullman* v. *Mayor*, 49 Barb. 57; *Mayor* v. *Gill*, 31 Md. 375; *Smith* v. *Appleton*, 19 Wis. 493; Pomeroy on Rem. etc.

These authorities clearly show that the plaintiffs are proper parties to bring this action, and that if the city council has exceeded its powers in making the contract, or failed to observe some material requirement under its charter, in an attempt to exercise the power conferred, whereby the funds of the people are to be unlawfully disposed of, a court of equity will restrain the execution of such contract, and enjoin the wrongful disposition of such funds. Taking this as conclusive of the right of plaintiffs to sue, of the jurisdiction of the court to hear and determine the case and grant the relief, we will examine the points presented by appellants in their order.

II. It is insisted by counsel for appellants that, in order to entitle respondents to the relief demanded, inevitable

injury to their property must be shown, and that this injury can result solely and alone from increased taxation, and that as the ordinance does not itself purport to increase such taxes, there is no case made by the complaint. Grant that this is true. Yet in every illegal expenditure of public moneys the law will presume injury, and that the diversion of a fund for illegitimate purposes will necessarily increase taxation. If the funds of the city can be so diverted, as in this case, and no additional taxation can be had to raise the necessary funds to defray the legitimate expenses of the city government, the benefits and advantages it was intended to bestow upon its citizens would be entirely defeated. The courts can never sanction the propositions, that as the city of Helena was authorized to levy six mills on the dollar of the taxable property of its inhabitants, the city council could appropriate it for an unlawful purpose or in an unlawful manner and leave them remediless. The very existence of a corporation depends upon the legitimate use of its funds for legitimate purposes. A departure from this salutary rule necessarily requires the raising of additional funds to maintain the municipality. But aside from this, each tax payer has a right to have this money applied in accordance with the trust. If his money is sought to be used in a way or for purposes not contemplated by the charter, injury and increased taxation will be presumed. · Equity affording a preventive remedy will enjoin the unlawful expenditure and thus avoid a multiplicity of suits. This is the result of the authorities we have cited, which includes the two first propositions presented by appellants, and would seem to be conclusive against them. It is the unauthorized illegal expenditure of public moneys to be met by taxation that constitutes the gravamen of this question. 101 U. S. 604, 609; 9 Iowa, 576; 34 Conn. 108; 22 id. 555, and · High on Injunctions, sec. 374, are authorities on this point.

And as bearing on the right to enjoin in this case we also cite: Cooley's Constitutional Law, p. 238, and note; 94 U.

S. 255 and 258; Dillon on Mun. Corp. sec. 381; 19 Iowa, 209; Wait's Act. and Def. vol. 4, p. 602; 12 Wall. 349. Also Pomeroy, Eq. Jur. secs. 258, 260 and note, and 270, when injury is said to be presumed from an unlawful and unauthorized act. It is quite easy to understand that, if the $15,000 of revenue when collected annually is not paid out for some unlawful purpose, it will be on hand for some legitimate and necessary purpose, and to that extent relieve the tax payer from taxation.

III. Under subdivision 3 of appellants' brief, authorities are cited to show that the appropriation of a fund to pay for a commodity to be delivered is not the creation of a debt. In the case at bar, under the charter, as the indebtedness and liabilities of the city shall not exceed $20,000, no reasonable person can doubt but that under this ordinance the city incurs an obligation and duty to raise the funds in the manner, for the purposes and to the extent provided for. Consequently the liability incurred amounts to $15,000 per annum for twenty years. We call especial attention to the phraseology of the act of congress and city charter upon this subject, and in connection therewith cite: *Buchanan* v. *Litchfield*, 102 U. S. 278; *Litchfield* v. *Ballon*, 114 U. S. 190, 192; *Springfield* v. *Edwards*, 84 Ill. 626.

The taxable property of the city of Helena, as appears from this complaint, is $5,000,000. This is shown from the last assessment made for territorial and county taxes. Four per centum on that amount is $200,000. The use and maintenance of one hundred and fifty hydrants for twenty years at the stipulated rate will be $300,000.

The indebtedness sought to be prevented by the act of congress includes, as we have seen, every liability or obligation to pay money, whether present, future or contingent. It cannot change the nature of the obligation or liability, so far as the duty to pay is concerned, when once fixed, although it may have depended, or now depends, upon the rendition of services or delivery of a commodity in the future. The obligation and liability to pay exists, and the

extent of such liability is fixed by the amount to be paid. When this is ascertained, it constitutes a debt the very moment it is due. Hence it may be that in some sense of the word the liability or obligation precedes the indebtedness and is not simultaneous with it. Nor is the contract divisible, as claimed by counsel, so as to permit the court to declare section 25 void, and uphold it as to the rest. When accepted it becomes an entire contract, and it is vain to say that you can strike from this contract the consideration which supports it upon the one side, without entirely destroying its mutuality and binding force.

It is in direct violation, we claim, of the city charter. Section 17, page 19, is as follows: " That said city shall not be authorized to incur any indebtedness on behalf of said city for any purpose whatever, to exceed the sum of $20,000." The latter portion of section 37, page 20, provides " that the aggregate amount of said bonds and all indebtedness and liability of the city for any and all purposes shall not at any time exceed the sum of $20,000." Now a liability is defined to be " the condition of one who is subject to a charge or duty which may be judicially enforced." The charge and duty of raising the revenue to meet the expenditure can and will be judicially enforced if this contract is declared to be valid. The extent of this liability is measured, as we have seen, by the amount of dollars and cents required to meet it. The very moment the money is due it is a debt, under the authorities cited by counsel for appellants. It is due when the commodity is furnished, and the liability to raise it and liability to furnish the commodity are unequivocally fixed by the ordinance. We can see no difference, under these provisions of the charter, whether the liability and indebtedness are created at the same time. Default in performing the duty of raising the funds, or a failure to pay them over when raised, would give rise to a cause of action to enforce the collection of the amount due on account of liability incurred, and it is to prevent this that relief is here sought, whether it be de-

nominated technically a debt or not. It is to be paid in a particular manner and out of a particular fund, and can consequently be enforced in the courts. To prevent a voluntary payment and performance of an unauthorized and unlawful act is what is sought to be accomplished. If it could not be enforced in the courts, it follows that a voluntary performance of it should be enjoined.

The bonded debt of the city as alleged is $19,500, and by this ordinance an annual debt or liability is created of $15,000, which is a liability for twenty years amounting to $300,000. Appellants do not cite any authorities that are applicable when the indebtedness or liability exceeding the sum prohibited are both involved. The theory adopted leaves out of consideration altogether the liability incurred, and seems to proceed upon the equitable doctrine that the court will consider that done which should have been done, and treat the obligation to pay on delivery as an actual payment. However convenient this may be to the debtor it can scarcely be said to be just to the creditor. He is very likely to resort to the liability duly incurred for the enforcement of his rights. It would scarcely be satisfactory to regard the fund appropriated by the ordinance, to pay for a commodity, " as tantamount to a cash payment." The liability to both provide it and pay it is incurred. The terms used by the charter are emphatic and significant, " and all *indebtedness* and *liability* of the city for *any* and *all purposes* shall not at *any time* exceed the sum of $20,000." We have italicised some of these words in order to call special attention to them in connection with the opinion of the supreme court, *supra,* and yet it is claimed that " the word liability is not used in the prohibitory clause relative to creating an indebtedness."

IV. We have contented ourselves thus far in taking up the questions discussed by appellants. They seem to have entirely lost sight of the grounds presented in the motion to dissolve the injunction, and the judgment of the court overruling·it from which the appeal is taken, and the ques-

tions for review involved. They have built their own-houses and then sought to tear them down. We will take the liberty of adding two additional objections to the ordinance, to those embodied in the fourth submission of appellants' brief.

3. Because it creates a monopoly, and grants special privileges to Woolston.

4. Because it ties up and embarrasses the legislative functions of future councils and is in violation of the powers expressly conferred by the charter.

Counsel for appellants cites the definition given by Lord Coke of a monopoly in support of the special privileges given under the charter for twenty years, extending from the date of its acceptance to the year 2006, and claims that no monopoly is thereby created.

And Lord Coke says: "So it is not a monopoly if that subject had not the common right or liberty before, to do the act, or possess or enjoy the privilege or franchise granted as a common right." Now under this, if it was a common right of the citizens and inhabitants of Helena to do the acts or possess the privilege mentioned in this ordinance, and Woolston did not possess such right, it would not be a monopoly or special privilege to confer the privileges granted as a common right. But when the common rights of the people are ceded to certain persons for certain purposes, and by their action exclusive rights are carved therefrom and sought to be conferred upon an individual, it is an exclusive privilege, franchise or immunity, and consequently a monopoly. The one is but a counterpart of the other. What difference, then, can it make if a municipality cannot create a monopoly or bind up its legislation indefinitely, whether the act of congress is confined to the legislative assembly or not?

If the municipality has not the inherent power to create a monopoly, and it has not expressly and unmistakably been conferred upon it by some legislative act, how does it help the case by citing authorities to show that the act men-

tioned was intended as a limitation upon the legislative assembly? By the ordinance special and exclusive privileges are sought to be conferred upon Woolston. He has under it the sole and exclusive right to furnish the city water for fire and sewerage purposes for twenty years and to maintain pipes and hydrants for that purpose. And this will operate to exclude others, even so far as furnishing the inhabitants is concerned. Now no such powers exist unless they are expressly conferred. The principle is universal that a municipal corporation has only such general powers as are clearly conferred upon it, with such subsidiary incidental powers as are necessary to the exercise of its well defined powers. In the case of *Saginaw Gas Light Co.* v. *City of Saginaw,* Albany Law Journal, Nov. 20, 1886, p. 412 *et seq.,* the court holds that in order to make a contract by which one man or a set of men are to erect, own and maintain pipes, hydrants and water for city purposes, the power must be expressly and unequivocally conferred, and that unless this is the case it is the duty of the city to erect and construct and own its water works and thereby prevent a monopoly in others; and we assert that this is an important and salutary rule. Guided, therefore, by these elementary principles of construction, and the mischief sought to be avoided by this salutary rule, let us see whether the city charter, the organic law of this municipality, has authorized this monopoly or provided for the erection and maintenance of its own hydrants. Section 8, page 8, of city charter, is creative of all the power the city possesses in this respect. It reads as follows: "To provide the city with water, erect hydrants and pumps, build cisterns and dig wells in the streets for the supply of engines and buckets."

Under this charter the city, by the ordinance in question, has sought to empower Woolston to lay his own pipes, erect and maintain his own hydrants, and furnish the city with water for twenty years. Whether this creates a monopoly, grants exclusive privileges, or curtails future legislative council action so as to make it void on that account,

we respectfully submit that no such powers are conferred by the charter. The power is expressly conferred upon the city to erect hydrants and pumps, dig wells, etc., in the streets, to supply the city with water, and the implied and subsidiary power necessary to carry out this express power is expended in the investment necessary to erect the same on its own account and for itself. It is unlike a case where the city is empowered to furnish or provide water. Here the specific way of doing so is clearly pointed out. By following it no question of monopoly, special privileges, or unreasonable hampering of future legislation will arise. To bend this language to let in such a construction is contrary to all precedent.

"In all cases of contracts to run for years the authority to make them should be clear. It is better that all parties should understand that there is a limit to the powers of municipal bodies in such cases." Per Drummond, J., *Garrison* v. *Chicago*, 7 Biss. 480; 1 Dillon on Mun. Corp. (8th ed.) 130 *et seq.; Baltimore* v. *Gill*, 31 Md. 375; *Wallace* v. *San Jose*, 29 Cal. 180; *French* v. *Burlington*, 42 Iowa, 614; *State* v. *Medbury*, 7 Ohio St. 537; *People* v. *Pacheco*, 27 Cal. 176; Cooley's Constitution, 236; *Durham and Daniels* v. *Trustees of the Village of Rochester*, 5 Cow. 465; Albany Law Journal, vol. 34, No. 21, 421; *City of New London* v. *Brainard et al.* 22 Conn. 555.

It would be rash to argue that the city council had power to make any ordinances except such as are conferred by its charter. The object of its ordinances is to carry out the powers expressly conferred, and such is its language as found in section 33, page 10. We do not believe any authorities can be found which will support an ordinance like this under section 8, page 8, of our city charter.

Whether a tax payer can question the validity of an ordinance because it creates a monopoly, or is unreasonable, or embarrasses future legislation of the council, does not involve the merits of the question. In the case at bar these very acts involve a want of power under section 8 of the charter.

If the charter was not violated by the ordinance this condition of things would not arise. If courts will ordinarily interpose against the exercise of unauthorized power when public funds are to be expended, it could certainly not diminish the force of the reason for so doing, because at the time it effectually squelched a monopoly, shut off a special privilege, or relieved legislative embarrassment. They simply afford good reasons for the language used in the charter, if any were required. Dillon on Mun. Corp. sec. 89.

Wait's Act. and Def. vol. 4, p. 602, and 30 Iowa, and 10 N. W. Rep., cited by counsel for appellants, do not announce a contrary doctrine. They do not involve cases where there is an excess of corporate powers under the charter whereby public funds are to be misappropriated, while this is the very question presented here.

The city, we conclude, has attempted to exceed the powers granted by its charter. It is not erecting its own hydrants and pumps, digging its own wells, building its own cisterns in its own streets to supply its own engines and buckets, and provide the city with water. At the end of twenty years, the expiration of this contract, the property remains the property of Woolston and his heirs and assigns, with the use of the streets forever, unless divested of it in some of the methods known to the law. The city must buy, at the end of twenty years, that which it was contemplated to erect and own, and this is just what was intended to be averted.

As to power of council, see City Charter, sec. 8, p. 8; sec. 33, p. 10; sec. 5, p. 13; sec. 17, p. 19; sec. 37, p. 20; sec. 1, p. 25; 27 N. Y. 611; Cooley's Const. 253; 24 Wis. 678; Dillon on Mun. Corp. sec. 61; Angell & Ames on Corp. sec. 262; 23 How. 435, 436, 437 and 438; 18 Ohio St. 262; 43 Iowa, 524; 24 Fed. Rep. 306, and 114 U. S. *supra;* 101 id. 791; 59 N. Y. 228; 7 Biss. 480.

IV. Passing to the fifth subdivision of appellants' brief they assign for respondents another objection to this ordi-

nance, and proceed to dispose of it very summarily. The objection we make to that branch of the ordinance is this:

Woolston does not obligate himself to furnish the city with water through his mains and hydrants without charge except for the purposes mentioned in section 11.

This would require the city to purchase the water; pay schedule rates as provided in section 15; is unreasonable, and would create a money demand against the city, subject to the same remedies and results as that incurred by the inhabitants. It is therefore unreasonable and creates a liability and indebtedness not authorized by its charter.

If the city has to pay for water for fire or sewerage purposes in the manner provided by section 15, the amount would be enormous, besides being prohibited by sections 8 and 37 of the charter, *supra.*

A correct solution of this question will require a consideration of the various sections of the ordinance in connection with each other in so far as they are applicable. They seem to have been adroitly drawn, and the result of the product of years of study and experience in the particular line of his success, and were disposed of by counsel representing the city at the time, perhaps, as hastily and summarily as the question is disposed of in their brief. Let us see how this matter stands.

Section 1 of the ordinance gives Woolston the right to lay mains and pipes through all the avenues, streets, alleys and public grounds of the city, for the purpose of furnishing said city and the inhabitants thereof with water.

Section 3 requires him to furnish a sufficient supply of water for the city and inhabitants thereof for any and all purposes.

Section 6 requires the construction and maintenance of one hundred and fifty hydrants, for the purpose of affording the city water for fire and sewerage purposes; *i. e.*, he constructs and maintains these hydrants to be used in this way and for this purpose.

Section 14 fixes the rates to be paid for water used

through these works, and the last subdivision fixes the rates not therein specially provided for.

Section 12 provides that Woolston shall receive no pay for his works from the city or its inhabitants when not in condition to furnish water for the causes mentioned.

Section 31 declares it to be the true intent, meaning and purpose of the ordinance to provide the city and inhabitants thereof with an ample supply of water for fire, sewerage, manufacturing, domestic and other purposes.

Section 20, among other things, provides that nothing therein contained shall be construed as abridging the rights of said Woolston and his successors and assigns, to furnish said city with all the water for municipal and fire purposes required by said city during the continuance of the ordinance.

Section 11 is as follows: " All water which may be required by said city of Helena for the use of any and all buildings owned or occupied by said city for municipal purposes, and for sprinkling and irrigating the streets of said city, shall be furnished by said Woolston, without cost or charge to said city."

Section 32 provides the manner in which Woolston shall accept the terms, provisions and conditions of the ordinance.

We have given in our judgment the substance of the sections applicable, in such transposed order as will best show their relative bearing and legitimate connection with each other.

It will be seen that there are three prominent facts deducible from these sections of the ordinance.

1st. Woolston has agreed to erect and maintain one hundred and fifty hydrants, for the use of water by the city for fire and sewerage purposes — for which no compensation is yet provided.

2d. That free water is to be furnished to the city (not for fire or sewerage purposes), but for buildings owned or occupied for municipal purposes, and sprinkling and irrigating the streets.

3d. That in all other cases not provided for, Woolston is to receive the rates mentioned in the last subdivision of section 15, and no pay being provided for the water to be furnished by the plant for fire and sewerage purposes, it is regulated by this section. Now we claim that section 23 simply provides payment for the use of hydrants erected and maintained for the use of water for the purposes of fire and sewerage for the city. These were the particular and limited purposes for which they were to be erected and maintained. And the expressions used imply no more. They simply provide for the payment of so much per annum for the use of the hydrants, for the use of water for those particular purposes. So far as the water and fire and sewerage affect the question in any way, they are simply limitations upon the use and purposes for which the city is entitled to the hydrants for the sum specified. Nowhere does he agree to furnish water free of charge for these purposes, while the designation of the particular instances in which he does propose to so furnish it are exclusive of all others. It is easy to descriminate between the effect of this section as it exists, and that which it would import if it provided for the payment of so much money for the maintenance and the use of the hydrants, and the use of water through the same for fire and sewerage purposes. By the use of "for" instead of "and" the whole meaning is changed, and leaves the words "use of the water through the hydrants," etc., to be construed as a limitation instead of purchase, so to speak.

The great length of this ordinance has required much more time than we otherwise would have consumed in presenting our ideas upon this point, and with a view of relieving the court to some extent we have done so, at the expense perhaps of being too prolix.

V. We come now to the consideration of the proposition presented by the sixth subdivision of appellants' brief. Counsel seems to have reserved this for about the last, so as to perpetuate themselves upon paper for a season, with

some degree of reason and consistency. We assert, without fear of refutation, that this involves a fatal infirmity. Were not the other questions involved of so much vital importance to the city as affecting a future course in securing a system of water works, we should have contented ourselves by answering this alone. But to the question: Because it is in violation of the charter provisions relative to advertising in case of contracts involving an expenditure of over $100.

Assuming, however, that the city, under the powers granted by its charter, had the right to make the contract embodied in, and contemplated by, the acceptance of this ordinance, could it do so without advertising for bids?

Section 13, article 7, page 15, of its charter provides as follows: " And in all contracts involving the expenditure of one hundred dollars or more, the city council shall advertise the same, with specifications, for a period to be prescribed by ordinance, and award the same to the lowest responsible bidder, and they shall advertise all contracts when convenient to do so."

Here is a wise and salutary condition imposed not by ordinance, but by the organic law of the city. It is admitted (or alleged and not denied) that no advertising was done, no publication of any plans or specifications of the works contemplated by the ordinance, or any other intended to be established by or through the city. So much importance is attached to charter provisions of the kind, that the utmost good faith is required in giving this notice. A sound and faithful exercise of discretion, in view of the particular object to be accomplished, is expected, and it cannot be arbitrarily or capriciously exercised, much less, as in this case, utterly ignored and disregarded. Counsel, by a process of reasoning remarkable for its apparent fallacy, concludes that the ordinance, with the acceptance of its " terms, conditions and provisions," does not constitute a contract, and does not involve the expenditure of $100 or more. We might here invoke their own language, that " this argument is so far-

fetched, transparent and infantine that its only cause for notice is on account of its extreme absurdity." If the city proposes to employ labor or " purchase any commodity " involving an expenditure of $100, the advertisement, when made a charter provision, is a condition precedent to the power to enter into the contract and make the expenditure.

The conclusions reached by appellants are that there is no contract, there is no indebtedness, there is no liability, and that the expenditure of $100 is not involved. If this be true, then its utter invalidity is established in another way, and the payments of the large sums threatened should be enjoined on that account, and Woolston could repudiate it at any time, even when its enforcement was not required. But to the main point. This advertisement of the contract proposed with specifications was intended to secure competitive bidding; it was to bring in bidders; it prescribes a basis upon which this is done; it refers directly to the means by which this opportunity is afforded; it thus defines the manner by which it is determined that competitive bidding was had, and it can be ascertained in no other way; it is a means of letting or selling a certain contract for the expenditure of many thousand dollars annually, and must be pursued. If the court will permit so utter a disregard of the charter in so important a matter as the letting of a contract for a system of public water works, lighting streets and squares, and providing and equipping the fire department, then the tax payers have no safeguard, and those barriers intended for their protection can be swept away at the behest of their improvident agents. It would no longer be a corporation whose powers are defined and limited by its charter, but becomes a municipal body exercising unlimited powers despite of its charter. Of course, when competitive bidding is afforded in the manner provided, the city council determines then who is the lowest responsible bidder. Had the method not been specifically pointed out by the charter, it would be left to the city to adopt such as it might deem advisable. But as it is, this discretion is entirely taken

from it. The city can never know when it receives the lowest competitive bid without this advertisement — that is, legally know it. Whether there were some competitive bids without it is not the question. Of course, if the advertisement required was had, and the city had accepted the bid, it could only be impeached by showing fraud, collusion or bad faith, which is not the question here.

The following authorities are conclusive of these questions, and we do not believe any can be found to the contrary: 1 Dillon on Mun. Corp. sec. 466 (438); *Pars* v. *Village of Greenhood*, 72 N. Y. 463, 471, 472; *Dickson* v. *Poughkeepsie*, 75 N. Y. 65; *Begler* v. *New York*, 5 Abbott, 51; *Brady* v. *Mayor, etc.* 20 N. Y. 316; *Weisbrod* v. *The Board of Supervisors of Winnebago County*, 20 Wis. 440; *Township of East Oakland* v. *Skinner*, 94 U. S. 255–258; Wait's Act. and Def. vol. 4, p. 603; *Newmeyer et al.* v. *Mo. & Miss. R. R. Co. et al.* 52 Mo. 84; 44 Ill. 9, 13, 14; *Chicago & N. W. R'y Co.* v. *Goss*, 17 Wis. 444–446; Cooley's Const. p. 237; *Swift* v. *The City of Williamsburgh*, 24 Barb. 427; *Goodrich* v. *City of Detroit*, 12 Mich. 279; *In the Matter of the Petition of Addison Smith and others, to vacate an Assessment*, 52 N. Y. 529; *Clark* v. *Crane*, 5 Mich. 153. In this connection, see, also, sec. 33, pp. 23 and 24.

The ordinance when accepted constitutes an entire contract. The parts assailed are vital and cannot be eliminated without impairing its mutuality and destroying its validity.

The rule of *caveat emptor* applies to provisions of this kind when contained in the charter. It involves a jurisdictional question, not an irregularity. But it is alleged that Woolston had actual knowledge of this failure to advertise, and he was admonished by apt words contained in the city charter, that no contract involving the expenditure of over $100 could be made without it. If the city fails to make an ordinance such as is required, it fails to put itself in a situation to contract for the expenditure mentioned, as much so as if it violated an ordinance required by the charter. 94 U. S. 258.

McLeary, J.   This was a suit in the district court of
Lewis and Clarke county, brought by William Davenport,
William C. Child, Thomas C. Power and Robert S. Hale,
against Theodore H. Kleinschmidt, as mayor, and John
Watson and others, as aldermen of the city of Helena, and
George F. Woolston, for a perpetual injunction against the
defendants, restraining them from in any manner carrying
out a certain contract, alleged to be illegal, by laying any
mains or water-pipes, or erecting any hydrants in the city
of Helena, or by issuing any warrants for any water sup-
plied to said city under the said contract.   On the 4th day
of December, 1886, the judge of the district court entered
an order enjoining the defendants from carrying out the
contract and from doing any act thereunder.   Afterwards
a motion was made to dissolve the injunction, for various
reasons, and the same was, on the 13th day of December,
1886, overruled; and from this order overruling the motion
to dissolve the injunction therein the defendants appeal to
this court.

George F. Woolston was not served with the summons in
this suit, nor with the writ of injunction; neither did he
appear in the district court nor take part in the motion for
dissolution; nor did he appeal to this court.   Hence he is
not before this court; and this cause must be considered as
if he were not a party thereto; and he is not directly af-
fected by the result of this proceeding.   The only parties
hereto properly before this court are the mayor and alder-
men composing the city council of the city of Helena, who
are the appellants heretofore named.   The contract alleged
to be illegal, on which this suit is based, is in the form of
an ordinance, passed by the city council, the terms whereof
were to be accepted by Woolston by filing a writing with
the city clerk of Helena.

A preliminary question, which meets us at the outset, is
whether or not the plaintiffs herein have the right to insti-
tute and maintain this suit.   The complaint alleges that
they are residents and tax payers of the city of Helena,

owning, in the aggregate, taxable property within the corporate limits of said city amounting in value to $250,000. This right of the plaintiffs, as tax payers, to maintain this suit, is certainly set at rest by the decision of the supreme court of the United States in the case of *Crampton* v. *Zabriskie*, 101 U. S. 609. Mr. Justice Field, in delivering the opinion of the court, says: "Of the right of resident tax payers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt, which they, in common with other property holders of the county, may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the state courts in numerous cases; and, from the nature of the powers exercised by municipal corporations, the great danger of their abuse, and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere, upon the application of the tax payers of a county, to prevent the consummation of a wrong, when the officers of those corporations assume, in excess of their powers, to create burdens upon property holders. Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill, by or on behalf of individual tax payers, should not be entertained to prevent the misuse of corporate powers." *Crampton* v. *Zabriskie*, 101 U. S. 609. Although this authority is entirely satisfactory, we may also refer to the following cases from the state courts, substantially to the same effect: *Williams* v. *Peinny*, 25 Iowa, 437, 438; *City of Springfield* v. *Edwards*, 84 Ill. 626; *Harney* v. *Indianapolis, etc.* 32 Ind. 244; *Terrett* v. *Town of Sharon*, 24 Conn. 108; *Newmeyer* v. *Missouri & M. R. R. Co.* 52 Mo. 84–89; *Mayor of Baltimore* v. *Gill*, 31 Md. 394; *Page* v. *Allen*, 58 Pa. St. 345; *Valparaiso* v. *Gardner*, 49 Amer. Rep. 417; 97 Ind. 1; and many other cases cited in these opinions.

The current of authority is to the contrary in New York, at least in the later cases, which have been followed in Kansas, Minnesota and Massachusetts. In some of the states the matter is regulated by statute, imposing the duty of bringing such suits upon some public officer; but where there is no statutory provision, it is almost the uniform practice, sanctioned by reason and authority, for any tax payer, or generally several, on behalf of themselves and others, to institute proceedings in a court of equity to prevent the misapplication of public funds by municipal officers. And this right is based on the ground that the threatened illegal corporate act will increase the burden of taxation, and thus injure the plaintiffs.

In the Missouri case above referred to, decided in 1873, Judge Ewing, in an exhaustive opinion, discusses the question and the authorities on both sides, and arrives at the conclusion " that the decisions which affirm the right of the plaintiffs, or those standing in the same relation to such controversies, to maintain the action, rest upon a more solid foundation of principle and reason than those holding the contrary doctrine." 52 Mo. 89.

Mr. Dillon, in his excellent work on Corporations, collates the authorities, and discusses the subject at some length. He says: " In this country, the right of property holders or taxable inhabitants to resort to equity to restrain municipal corporations, and their officers, from transcending their lawful powers, or violating their legal duties, in any mode which will injuriously affect the tax payers, such as making an unauthorized appropriation of the corporate funds, or an illegal disposition of corporate property, or levying and collecting void and illegal taxes and assessments upon real property, under circumstances presently to be explained, has been affirmed or recognized in numerous cases in many of the states. It is the prevailing doctrine on this subject." 2 Dill. Mun. Corp. § 731, p. 829. And the same doctrine is laid down explicitly by Mr. High, in his standard work on Injunctions, § 1298.

The right of these plaintiffs, being tax payers, to bring this suit, and, in a proper case, to procure an injunction to restrain the illegal disposition of the city's money, cannot be doubted. But it is claimed by the appellants that George F. Woolston is a necessary party to this litigation; that he has been made a party defendant to this suit; that his rights are affected by this injunction; and that he has not been served with process, or had an opportunity to be heard in the premises. It does not seem to us that Woolston is a necessary party to this suit. The question is one primarily between the tax payers of the city of Helena and the city council, to determine whether or not there is about to be committed the misappropriation of funds in the city treasury. Woolston is not a tax payer, nor even a citizen of the city of Helena, nor of the territory of Montana, so far as appears from the record of this case. He has shown no interest in the public funds of the city of Helena. No such connection appears between him and the other defendants as would require him to be summoned and enjoined before this case could proceed between the parties before this court. Certainly the defendants, the mayor and aldermen of Helena, cannot complain that he is not brought in. He files a written argument in the form of an opinion by eminent counsel residing in New York; but otherwise he is a silent spectator of the proceedings in the court below and in this court. This clearly appears to us as a case where a complete determination of the controversy can be had without the presence of Woolston; and the court below properly disregarded this objection. R. S. Mont. § 27, 1st div. p. 44. But it does not appear from the briefs that this point is insisted on by the counsel for appellants in this court, and for that reason, if for no other, it might be passed by without further consideration.

If, as is alleged by the appellants in their motion for dissolution, this injunction, being granted without the summons being served on other parties, would be nugatory and of no effect, then no one is injured by the order, and no

one has the right to complain. But we do not think that such would be the result. Parties sufficient for the determination of this controversy, and making the injunction, unless dissolved, effectual, appear to us to be now before this court; and the case may properly proceed to a complete determination of the controversy and a settlement of the issues involved. But, before we proceed to a discussion of the main issues involved herein, we may as well dispose of some other matters which may be regarded as preliminary in their nature, or at least incidental to the merits of the case.

It is suggested by counsel on behalf of George F. Woolston that, conceding, for the sake of argument, that the ordinance may be void in some particulars, as being *ultra vires*, and positively forbidden by the charter of the city or the act of congress, still there are certain sections of it, as those that grant the license or privilege of laying pipes or mains in the streets of the city, which must be held valid, inasmuch as this privilege or license is not exclusive, and the city council has the undoubted right to grant such a license or privilege to any person. It is contended that the ordinance in its several parts is severable, and that such portions thereof as are void should be annulled, and such parts as are valid should be suffered to remain in force; or, as it may be stated in other words, that, although the ordinance may be void as a contract to pay money out of the city treasury, still, as a license to lay pipes and mains in the streets of the city, it is valid. However reasonable this view of the matter may be, and however well supported by the authorities, Woolston is not in a position to urge this court to act thereon. He is not before the court. If he was dissatisfied with the terms of the order granting the injunction, he should have appeared in the court below, and made his motion to dissolve or modify the order or the writ, so as to exclude this prohibition therefrom, and leave the license granted to him to lay pipes and mains in the streets in full force. Not having

taken this course, not having appeared, not having made any motion in the court below, not having appealed to this court, the powers of this court are not invoked by Woolston, and cannot be exerted in his behalf.

But the same suggestions are made on behalf of the members of the city council, who are properly before this court as the appellants in this case. In so far as that clause of the injunction which forbids "laying any mains or water-pipes, or erecting any hydrants, in said city of Helena," is concerned, it is very evident that this was not intended to apply to these appellants. No allegation in the complaint sets out that they are about to lay pipes and mains, or to erect hydrants in the city; and it was not intended by the order of injunction that they should be forbidden so to do. Indeed, it was argued and insisted upon by counsel for respondents that the city council should construct the water-works, for and on behalf of the city, and this would require them to lay the pipes and mains in the streets, and erect the necessary hydrants. But it is clear from the pleadings and orders herein made that this clause of the writ and the order could only apply to Woolston and his servants or agents; and, as we have already seen, he has not complained of it, or made any motion or appeal in regard thereto. And inasmuch as the appellants are not affected by this portion of the writ, it need not be determined by us at this time whether the different portions of the ordinance are severable or not.

So we pass from the preliminary matters to the main questions involved herein. There was no answer in this case below. The record consists of the complaint, with the ordinance attached as an exhibit, the summons, the order granting the injunction, the writ of injunction, the motion to dissolve, and the order made thereon. The question submitted is the correctness of the order made by the court below, overruling the motion for dissolution of the injunction. Various reasons are assigned why this injunction should have been dissolved,— that it was improvidently is-

sued; for want of equity in the complaint; for want of jurisdiction; and because the injunction does not follow the complaint. None of these objections were insisted on in the briefs or the arguments of counsel, except that there was no equity in the complaint, and that the injunction was improvidently or prematurely issued. The objections that the court had no jurisdiction, and that the order exceeds the complaint, may be considered as abandoned, if not untenable. We shall only consider the reasons presented, which are sufficiently broad to cover the whole question at issue in this case.

Then, let us first examine the equity in the bill, or the reasons for granting the injunction set forth in the complaint. They are briefly as follows: That the plaintiffs are tax payers of the city of Helena, and the defendants compose the mayor and city council thereof; that the defendants are about to enter into an illegal contract with Woolston for supplying the city with water, whereby there will be illegally expended out of the city treasury the sum of $15,000 per annum, or $1,250 per month, for the next twenty years. The contract intended to be made consists of an ordinance on the part of the city council, and a written acceptance thereof by Woolston. It is contended that the ordinance is void, for the reason that the city council has no power to make it, (1) because it is not authorized by the charter and is *ultra vires;* (2) because it is forbidden by the charter; (3) because it is forbidden by the act of congress of July 10, 1886.

The ordinary powers of municipal corporations are well defined and understood. It is well said by Mr. Dillon, in his work on Municipal Corporations, that "it is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: *First,* those granted in *express words; second,* those *necessarily or fairly implied* in or *incident* to the powers expressly granted; *third,* those essential to the declared objects and purposes of the corporation,— not simply con-

venient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation, the charter or statute by which it is created is its organic act." 1 Dill. Mun. Corp. § 55, p. 173. These views are approved by the courts in the following cases: *Spaulding* v. *Lowell,* 23 Pick. 74, 75; *Minturn* v. *Larue,* 23 How. 436; *Saginaw Gas-light Co.* v. *City of Saginaw,* 34 Alb. Law J. 412.

The city charter of Helena contains the following provisions: "The city council shall have power to provide the city with water, erect hydrants and pumps, build cisterns, and dig wells in the streets, for the supply of engines and buckets (section 8, page 8), to provide for the prevention and extinguishment of fires." Section 18, page 9. Under the powers to provide the city with water, and to erect hydrants, and to provide for the prevention and extinguishment of fires, are doubtless included, as necessarily incident, thereto, or implied therein and essential thereto, the power to do this by agents employed for that purpose, and to make contracts with individuals or other corporations to do the same. The city could scarcely accomplish such objects in any other way; and it is hardly probable that any other method was contemplated in the granting of the charter. Though, doubtless, the city council could cause water-works to be built, and own, operate and control them thereafter as the property of the city, the charter does not limit the city corporation to either one method or the other. Any appropriate means necessary to carry out the objects would be properly within the powers granted to the city council in the charter. *East St. Louis* v. *East St. Louis G. L. & C. Co.* 98 Ill. 424, 425.

Then, the power to provide the city with water, by making a proper contract with some person to erect water-works, and sell water to the city, being conceded, the next question that presents itself is as to the power of the city to make this particular contract. Is the present such a con-

tract as to be beyond the power of the city council to enter into so as to bind the municipal corporation? Does this contract create a monopoly? For, if it does, it goes beyond the power of a city council. Monopolies may be created; but they must be called into being by the sovereign power alone. A city council has no authority to grant to any person a monopoly, even where no express prohibition is found in the charter or other acts of the legislature. Monopolies are contrary to the genius of a free government, and ought not to be encouraged by the people, or countenanced by the courts, except when expressly authorized by positive law. In many of the state constitutions an announcement of this principle is clearly and explicitly declared. A monopoly is defined by the best and oldest law writers to be " an institution or allowance by a grant from the sovereign power of a state, by commission, letters patent, or otherwise, to any person or corporation, by which the exclusive right of buying, selling, making, working or using anything is given." 2 Bouv. Law Dict. p. 194; 5 Bac. Abr. S. V.; 3 Coke, Inst. 181. It has also been well defined in a late work as follows: " The popular meaning of 'monopoly' at the present day seems to be the sole power (or a power largely in excess of that possessed by others) of dealing in some particular commodity, or at some particular place or market, or of carrying on some particular business." 2 Rap. & L. Law Dict. 834, 835.

As far as this case is concerned, either of the definitions is sufficiently clear, and both are applicable. It cannot be said that Woolston is to have, under the ordinance No. 93, any exclusive right to use the streets of the city for the laying of pipes or mains. It is believed this is provided against in sections 1 and 9 of the ordinance. But the twentieth section reads as follows:

"Section 20. The said city of Helena expressly reserves. the right to license and grant charters to other persons and companies, to convey, distribute and sell water within said city to private consumers, not, however, in violation of this

ordinance; but nothing in this section contained shall be construed as abridging the rights of said George F. Woolston and his successors and assigns to furnish said city with all the water for municipal and fire purposes required by said city, during the continuance of this ordinance."

This gives Woolston the exclusive right and power of selling water to the city of Helena, for the period of twenty years, at the minimum rate fixed in the contract; and his rights in the premises are not to be abridged by any misconstruction thereof. If this is not a monopoly, it is very difficult to conceive of one. It is true that there is no restriction on any other person or company furnishing or selling water to the people of Helena, if any one could undertake to do so without the benefit of the city's patronage; but it is scarcely likely that any other company could or would undertake to supply the people in competition with Woolston, supported under this contract by the powerful advantage of the exclusive custom of the city of Helena, at rates already fixed and unchangeable. Then, as to the citizens also, this contract secures a practical monopoly, although, speaking from a legal standpoint, the monopoly is confined to the water used by the city for the extinguishment of fires, and the cleansing of sewers, and other municipal purposes.

But it is claimed by counsel, in a written argument filed herein, that there is no " *exclusive privilege* " or monopoly granted to Woolston or his associates, because the ordinance " expressly provides that nothing therein contained shall give to him or them the exclusive right of occupying the streets, or conveying, distributing, or selling water throughout the city. . . . The reservation here is ample to allow the city, at any time, to grant the use of its streets to any other water company, *and agree, so far as the needs of the city might require, to take water from it.*" So far as the use of the streets is concerned, and even in regard to conveying, distributing and selling water, the position is well taken. No exclusive privilege is granted as to these. But in regard to the city reserving the power at any time to

agree, so far as the needs of the city might require, to take water from any other water company than that of Woolston, the provisions of the twentieth section, which certainly escaped the attention of the eminent counsel, have effectually forbidden that. The rights of Woolston to furnish all the water required for municipal purposes are not to be, and cannot be, abridged by any other person, no matter at what rate or on what terms, within the next twenty years, he may wish to supply the city with water. This is certainly an exclusive privilege; and it is as thoroughly well guarded as language can well make it.

The case of the *Union Ferry Company*, 98 N. Y. 150, cited by counsel, has no similarity to the case at bar. In that case the learned judge, Rappalo, discusses the meaning of the terms " exclusive privilege, immunity, or franchise," and gives several of the most familiar instances of cases which come within the constitutional inhibition of the state of New York in regard thereto. He says: " The word ' exclusive ' is derived from ' *ex*,' out, and ' *claudere*,' to shut. An act does not grant an exclusive privilege or franchise unless it shuts out or excludes others from enjoying a similar privilege or franchise." 98 N. Y. 151. That is exactly what this ordinance does in regard to furnishing water to the city of Helena. He then enumerates several well-known cases of monopoly or exclusive privileges or franchises, among others the following: " The charter of the Mohawk Bridge Company, which prohibited ferries across the river one mile above and one mile below the bridge (*Mohawk Bridge Co.* v. *Utica & S. R. Co.* 6 Paige, 554); the lease by the corporation of the city of New York, in 1814, of the Fulton ferry, in which the corporation covenanted that it would not grant or permit any other ferry to the southward of the ferry at the Catherine slip (*Costar* v. *Brush*, 25 Wend. 628); the charter of the Delaware Bridge Company, which prohibited the erection of any other bridge, or the establishment of any other ferry, within two miles above or below (*Chenango Bridge Co.* v. *Binghamp-*

*ton Bridge Co.* 27 N. Y. 87, and 3 Wall. 51); the charter
of the West River Bridge Company, which granted the
exclusive privilege of maintaining a bridge across West
river (*West River Bridge Co.* v. *Dix*, 16 Vt. 466); the
charter of the Boston & Lowell Railroad Company, which
provided that no other railroad should, within thirty years,
be authorized between Boston and Lowell, and was held to
be a contract protected by the constitution, as in the *Bing-
hampton Bridge Case*, 3 Wall. 51; the grant of an exclusive
right to a line of telegraph between Sacramento and San
Francisco, all other persons being prohibited from running
a line within one-half a mile, or doing business between
those cities (*California State Tel. Co.* v. *Alta Tel. Co.* 22
Cal. 398)." Case of *Union Ferry Co.* 98 N. Y. 151, 152.
These examples illustrate the general principle within
which the case at bar most unquestionably falls. This prin-
ciple is also illustrated in the cases of *New Orleans G.
Co.* v. *Lousiana L. etc. Co.* 115 U. S. 654; *New Orleans W.
W. Co.* v. *Rivers*, 115 U. S. 674; and *Louisville Gas Co.* v.
*Citizens' Gas-light Co.* 115 U. S. 691, all of which are con-
fessedly monopolies, but having been granted by the state
legislature, the sovereign power, were protected by the
constitution of the United States, prohibiting the impair-
ment of the obligation of contracts. The exclusive right,
or the sole power, is the test in every instance, as is laid
down in the definitions already quoted. Tried both by the
square of principle and the plumb-line of authority, this con-
tract proves itself, in all essential particulars, a monopoly;
and for that reason the making of it is beyond the powers
of the city council, unless it were expressly authorized by
the legislature.

But it is insisted by the counsel for respondents that the
making of this contract, or the passing of this ordinance, is
*ultra vires*, " because it ties up and embarrasses the func-
tions of future councils." Every ordinance in the nature of
a contract would do this to some extent. And, unless the
contract entered into by means of this ordinance should

bind the city corporation for an unreasonable time, this objection would not be fatal.  Is twenty years a reasonable time?  The city charter provides for the election of the mayor and half the aldermen in April of each year.  City Charter, art. 4, §1.  The complaint alleges the taxable property of the city of Helena to be not more than $5,000,000; that the bonded indebtedness of the city amounts to $19,500; that the floating debt, in outstanding warrants, amounts to $15,000.  Four per cent. of the taxable property of the city would amount to $200,000.  The charter permits the levy of taxes to the extent of three mills on the dollar, for general purposes, and the same for fire department purposes.  City Charter, p. 25, amend. 1885.  On the present valuation these levies might amount to $15,000 each, if the taxing power was exerted to the limit.

The city of Helena was chartered in 1881.  Twenty years ago it was a small mining camp on the banks of Last Chance gulch, containing a few hundred people.  The last official census of the city, taken in 1880, shows a population of not more than four thousand.  Reliable *data* place the present population at about ten thousand.  The ordinance provides that Woolston shall receive for the water running through each of the first one hundred and fifty hydrants provided for, $20 per year out of the general fund, and $80 per year out of the fire department fund, being $100 for each hydrant altogether, and amounting in the aggregate, for the one hundred and fifty hydrants, to $15,000 per annum.  Then, as the mains are extended, additional hydrants are required to be erected, and for these Woolston is to receive $13 per year out of the general fund, and $52 per year out of the fire department fund, making in the aggregate $65 per year for each additional hydrant.  If ten miles more of pipe should be laid, at least one hundred additional hydrants must be paid for, at an annual cost of $6,500.  If the whole cost of the first one hundred and fifty hydrants were to be paid out of the fire department fund, it would take every dollar which could be placed into that

fund, at the present valuation. This ordinance is designed to be irrepealable and unchangeable for the period of twenty years. We have a right to consider all these things in determining whether or not twenty years is a reasonable time for such a contract to run. Under all the circumstances indicated, we cannot consider that the city council has the right to bind such a city as Helena by such a contract, for so long a period. We are not called upon to indicate what would be a reasonable time for which the city might make such a contract, if at all. It is sufficient for us to say in this case that twenty years is not a reasonable time. It is useless to argue that, if the council has power to bind the city for twenty years, it has the power to bind it for a hundred or a thousand years; or, on the other hand, to say that if the council cannot bind the city for twenty years, it cannot do so for one year, or one month. Such assertions of extreme cases may answer for illustration; but as arguments they are fallacies, which cannot bear the strong light of reason.

In considering the rights, powers and liabilities of a city council, a plain and obvious distinction is drawn between the character of a city as an individual or corporation and as a branch of the government, or, as it may be termed, between its corporate and its legislative powers. This distinction is well expressed by Chief Justice Savage in the case of *Presbyterian Church* v. *City of New York*, 5 Cow. 540. He, in speaking of the city, says: "In ascertaining their rights and liabilities, as a corporation or as an individual, we must not consider their legislative character. They had no power, as a party, to make a contract which should control or embarrass their legislative powers and duties. Their enactments, in their legislative capacity, are to have the same effect upon their individual acts as upon those of any other persons, or the public at large, and no other effect." 5 Cow. 540.

We have already considered the matter as far as the contract might restrain future councils in their corporate

capacity. There is no inhibition on such a restraint, except the reasonableness of the time for which the restriction is to continue, which has been already discussed at length, and the conclusion reached that the limit of twenty years is too long to be regarded as reasonable. If such a contract should prove to be a restriction on the legislative powers of the city council, it would be void, in so far as a conflict might ensue. But it is not the province of a court to explore the future, in order to find out what legislative acts future city councils may, in their wisdom, see proper to ordain. Whenever, acting within the proper scope of their limited and delegated powers, they make a police regulation, which unavoidably curtails or restricts or prevents the exercise of any right theretofore existing, under a lawful contract, which they had previously made with any other corporation or individual, then the contract, to that extent, must give way. But we cannot now hold this contract void, because it may, at some future time, conflict with municipal legislation. *Presbyterian Church* v. *City of New York*, 5 Cow. 539.

But is such a contract as that proposed by the ordinance in controversy actually forbidden by the charter of the city, as is contended by the respondents? Let us examine the charter, for the purpose of pointing out the precise section imposing the restriction. It is therein prescribed "that said city shall not be authorized to incur any indebtedness on behalf of said city, for any purpose whatever, to exceed the sum of $20,000." Section 17, as amended by the act of 1883, p. 19 of Charter. The allegations of the complaint, which, for the purpose of this case, are for the present taken as true, show the present bonded indebtedness of the city to be $19,500, and the floating debt, consisting of outstanding warrants, to be $15,000. No distinction is drawn in the charter between bonded debt and floating debt, and, from the figures presented, it clearly appears that the limit has been already reached, and that the city cannot incur any further indebtedness, until some of that

outstanding has been discharged, or the limit enlarged by
the legislature.   Then if, by entering into the proposed con-
tract, the city council would "incur an indebtedness," the
same is plainly prohibited by the express terms of the
charter.

A distinction is drawn by counsel for the appellants be-
tween the terms "debt" or "indebtedness," and "liability,"
and it is asserted as too plain for discussion that this con-
tract creates no debt or obligation in the nature of a debt
"*in præsenti*," and that "no indebtedness or even liability
on the part of the city to pay for this water arises until the
hydrants have been supplied, and the water furnished to
them for a given month."   Let us inquire what is the proper
signification of the term "indebtedness," as used in the re-
strictive section of the charter.   Webster defines "indebt-
edness" as "the state of being indebted or placed in debt,
or under an obligation, or held for payment or requital."
This remits us to the proper meaning of the term "debt."
Bouvier defines a debt to be a sum of money due by a cer-
tain and express agreement.   1 Bouv. Law Dict. 436.   One
of the latest law lexicographers defines debt as follows:
"In the strict sense of the word, a debt exists when a certain
sum of money is owing from one person (the debtor) to an-
other (the creditor).   Hence, debt is properly opposed (1) to
unliquidated damages; (2) to liability, when used in the
sense of an inchoate or contingent debt; and (3) to certain
obligations not enforceable by ordinary process.   Debt de-
notes not only the obligation of the debtor to pay, but
also the right of the creditor to receive and enforce pay-
ment."   1 Rap. & L. Law Dict. 351.   Blackstone, in his
Commentaries, defines the word as follows: "The legal ac-
ceptation of 'debt' is a sum of money due by certain and
express agreement; as by a bond for a determinate sum; a
bill, or note; a special bargain; or a rent reserved on a
lease, where the quantity is fixed and specific, and does not
depend upon any subsequent valuation to settle it."   3 Bl.
Comm. 154; 2 Cooley's Bl. 101.

So much for the lexicographers and text writers; but what say the courts? In the case of *Gray* v. *Bennett*, in 1842, the supreme court of Massachusetts say: "The word 'debt' is of large import, including not only debts of record or judgments, and debts by specialty, but also obligations arising under simple contract, to a very wide extent; and, in its popular sense, includes all that is due to a man under any form of obligation or promise." *Gray* v. *Bennett*, 3 Metc. 526.

But the precise term "indebtedness," as used in this charter, has been heretofore many times interpreted by the courts. The constitution of Iowa has a provision as follows: "No county, or other political or municipal corporation, shall be allowed to become indebted, or in any manner, or for any purpose, to an amount in the aggregate exceeding five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax list previous to incurring such indebtedness. Article 11, § 3, Code, 787." *Burlington Water Co.* v. *Woodward,* 49 Iowa, 61. In construing this very provision of the constitution, the supreme court of Iowa, in a well considered case, uses the following language: "It is believed the constitution applies not only to a present indebtedness, but also to such as is payable on a contingency at some future day, or which depends on some contingency before a liability is created. But it must appear that such contingency is sure to take place, irrespective of any action taken or option exercised by the city in future. That is, if a present indebtedness is incurred or obligations assumed, which, without further action on the part of the city, have the effect to create an indebtedness at some future day, such are within the inhibition of the constitution. But if the fact of the indebtedness depends upon some act of the city, or upon its volition, to be exercised or determined at some future date, then no present indebtedness is incurred, and none will be until the period arrives, and the required act or option is exercised, and from that time only

can it be said there exists an indebtedness." *Burlington Water Co.* v. *Woodward*, 49 Iowa, 62. This case is analogous to the case at bar. Here we have a contract which involves a liability to pay money on a contingency which is morally sure to take place, irrespective of any action taken or option exercised by the city in future. All right to control the matter passes from the city with this ordinance; and the liability becomes fixed on the performance of the work by Woolston, which the city is powerless to prevent. This case above quoted from is the latest Iowa case to which we have been referred; and, as the similar provisions in the constitutions of Illinois and Indiana seem to have been copied from that of Iowa, we think, if there should be a conflict, the decisions of the supreme court of Iowa should be preferred. It is a familiar rule that, when a clause is taken from the constitution or statute of another state, it will be deemed to have the meaning given to it by the courts of that state. *City of Valparaiso* v. *Gardner*, 49 Amer. Rep. 423. In all of the water cases arising in the state of Iowa, we are met with a general statute, which authorized all cities to contract for the erection of waterworks, and to pay for the water used by a special fund, raised by a special annual tax, not to exceed five mills on the dollar; and such contracts with water companies were held not to create a debt against the cities, because the water companies could never have any general claim against the cities, but were held to look to the special fund alone for the satisfaction of their demands. *Burlington Water Co.* v. *Woodward*, 49 Iowa, 59; *Grant* v. *City of Davenport*, 36 Iowa, 401.

Indiana has a constitutional provision similar to that of Iowa; and the latest case decided in construction of it is the case of *City of Valparaiso* v. *Gardner*, 97 Ind. 1. The contract entered into between the city and Gardner was held by the court not to be an indebtedness, mainly on the ground, it seems, that the supplying of water was one of the legitimate current expenses of the city government;

and it was shown in the answer "that the annual revenues of the city are sufficient to pay all the ordinary expenditures of the city, and the water rent of $6,000 per annum, besides providing for the accumulation of a sinking fund, as the law requires." The court, after discussing several cases, says: "When the current revenues are sufficient to fully pay the current expenses necessarily incurred to maintain corporate life, there cannot be said to be any debt." 49 Amer. Rep. 425. In a well-considered case, the supreme court of Indiana reviews all the Iowa and Illinois cases and many others, and, under the constitutional provision above referred to, says: "By 'indebtedness,' in this connection, we mean an agreement of some kind by the city to pay money, where no suitable provision has been made for the prompt discharge of the obligation imposed by the agreement. It was obviously the intention of the legislature in submitting, and of the people in adopting, the thirteenth article of the constitution, to arbitrarily restrict the power of municipal corporations to contract debts to a limited per centum of their taxable property, and to require, when that limit of indebtedness has been reached, that such corporations shall be prepared to pay for whatever of value they may obtain, without the inconvenience of any further indebtedness for any purpose whatever." *Sackett* v. *City of New Albany*, 45 Amer. Rep. 472, 473.

For a construction of a similar constitutional provision, we may examine the case of *Prince* v. *The City of Quincy*, 105 Ill. 142, 143, in which the supreme court of Illinois reviews several Illinois cases, and, through Mr. Justice Mulkey, who delivered the opinion of the court, say:

"While the provision of the constitution just cited declares, in emphatic terms, that a city or other municipality, whose existing indebtedness already exceeds the constitutional limit, as was the case here, shall not become further indebted 'in any manner or for any purpose,' it is seriously contended by counsel for appellant that a municipality thus circumstanced may become indebted for supplies to

meet its ordinary wants and necessities. To so construe the constitution would be to add a provision, in the nature of an exception, to the constitution, which the framers of that instrument did not see proper to insert. This, as is well settled by an unbroken current of authority, is not permissible, where the language of the law is clear and unambiguous, as is the case here, except where to give effect to the language used, according to its literal terms, would lead to a gross absurdity or manifest wrong or inconsistency, which courts will not impute to a legislative body. That no such consequences will flow from giving effect to this provision of the constitution, according to the obvious meaning of the language in which it is conceived, will hardly be claimed by any one. The object and purpose of the framers of the constitution, in adopting this provision, have, on more than one occasion, received the deliberate and mature consideration of this court, and we do not feel called upon to repeat what we have already said on the subject, but will content ourselves with a reference to the cases containing the previously expressed views of this court in relation to it." *City of Springfield* v. *Edwards*, 84 Ill. 626; *Law* v. *People*, 87 Ill. 385; *Prince* v. *City of Quincy*, 105 Ill. 142, 143. The supreme court of Illinois, in the case of *City of Springfield* v. *Edwards*, 84 Ill. 631 *et seq.*, refers to the cases of *Grant* v. *City of Davenport*, 36 Iowa, 396; *People* v. *Pacheco*, 27 Cal. 176; *Koppikus* v. *Capitol Com'rs*, 16 Cal. 253; *State* v. *McCauley*, 15 Cal. 455; *State* v. *Medbery*, 7 Ohio St. 522; and *State* v. *Mayor*, 23 La. Ann. 358,— which are said to support the proposition "that, when liabilities are created, and appropriations are made, which are within the limits of the revenue accruing to meet them, they are not debts within the meaning of the prohibition of the constitution; and that temporary loans are not, when within the limits of the revenue expected to be realized." Commenting thereon the court say: " We are only prepared to yield our assent to the rule recognized by the authorities referred to, with these qualifications: *First.* The tax ap-

propriated must at the time be actually levied. *Second.* By the legal effect of the contract between the corporation and the individual, made at the time of the appropriation, the appropriation and issuing and acceptance of a warrant or order on the treasury for its payment must operate to prevent any liability to accrue in the contract against the corporation." "But, until a tax is levied, there is nothing in existence which can be exchanged [for the warrant]; and an obligation to levy a tax in the future, for the benefit of a particular individual, necessarily implies the existence of a present debt in favor of the individual against the corporation, which he is lawfully entitled to have paid by the levy."

These views appear to us sound and correct; and they apply with peculiar force to the case at bar. In this case the tax to meet these expenses is not actually levied, and the issuance of the warrant does not operate to prevent any liability, but is the very best evidence of the liability of the city to the contractor. No warrant could issue in his favor unless a debt existed to liquidate, for which the warrant was given. And should it not be paid when presented, and no fund is provided by this ordinance therefor, a suit against the city could at once be begun to enforce payment. Under the authorities above cited, reviewed and quoted, we are constrained to hold that the contract with Woolston creates an indebtedness, within the true intent and meaning of the act of the territorial legislature, amending the city charter and limiting the power of the city council to "incur any indebtedness on behalf of said city for any purpose whatever to exceed the sum of $20,000." There is no special fund provided, as in Iowa, out of which these water-rents can be paid when they become due. There are no funds on hand, as in Indiana, to meet the demands with the cash when presented. But, as in Quincy, Illinois, the warrants, when issued, are more than likely to become a part of the floating debt which now, in warrants, amounts, according to the record in this case, to more than $15,000. It is true that

the ordinance says it shall be "the duty of the city council, during the continuance of this ordinance [that is for the next twenty years], to levy annual taxes, under the provisions of the charter of said city authorizing the levy of taxes for general purposes and for fire department purposes, sufficient in amount to provide funds to meet the appropriation hereby made;" but such an enactment cannot be said to make provision for the payment of the water-rents as they fall due.

As the tax-rolls now stand, a levy of three mills would leave only $3,000 in the fire department fund, and $12,000 in the general fund, after satisfying the monthly demands of Woolston and his associates for one year. It nowhere appears that this sum would be sufficient for the other necessary current expenses of the city, or, as it is elsewhere expressed, "sufficient to sustain corporate life in the city." The establishment of thirty-eight more hydrants, in addition to the one hundred and fifty provided for, would more than exhaust the whole fire department fund, and leave only $10,024 in the general fund. And the laying of four miles additional water-mains would make it incumbent on the city to pay the rent for forty additional hydrants, which might be done at any time under this contract. But for the one hundred and fifty hydrants which are to be erected at once, the city, under this contract, would have to pay a monthly rental of $1,250; and whatever may be said of the payment of $15,000 in the course of a year, or of $300,000 in the course of twenty years, no one can reasonably deny that an indebtedness is created, within the true intent and meaning of the charter, to the amount of $1,250, which will have to be paid as soon as the water has been standing in Woolston's hydrants, in the city of Helena, for the period of one calendar month. But it is contended that this is a cash transaction, and that, as soon as the month expires, the money will be waiting for Woolston at the city treasury. If so, according to the record herein, he will be more fortunate than some other creditors of the city, who hold the $15,000 of

unpaid warrants now outstanding. But the city of Helena has already exceeded the limit of indebtedness fixed by the charter, and no further debts can be incurred, without further authority from the law-making power of this territory.

But we must come directly and squarely to the proposition insisted on by the respondents, that the contract proposed to be made transcends the thirty-seventh section, as amended, of the city charter. That section, in full, reads as follows:

" Section 37. That the city council shall at any time, when they shall deem it expedient for the interests of the city, for the purpose of paying the debts of the fire department, or for the erection of permanent improvements, or for taking up outstanding warrants against the city treasury, have authority and may issue, on the credit of the city, bonds, with interest-bearing coupons, payable semi-annually, and in such amount as may be necessary for the purpose herein specified; provided, that the aggregate amount of said bonds, and all indebtedness and liability of the city for any and all purposes, shall not at any time exceed the sum of $20,000." Charter of Helena, p. 20.

Let us consider the section without regard to section 17, preceding. It is insisted by counsel for appellants that this section of the charter alludes only to funding the indebtedness and the issuance of bonds. The restriction therein contained, though in the form of a proviso, is none the less effective in its operation, and forbids not only the creation of any *indebtedness*, but even of incurring a *liability*, to exceed $20,000. But it is conceded the contract with Woolston, though it does not create a debt, does create a liability, but it is contended that there is a broad distinction between these terms. Whatever may be the general rule in regard to the signification of these terms, it clearly appears that the proviso to section 37 (Charter, p. 20) is a legislative construction of the term "indebtedness" used in section 17 (Charter, p. 19) of the same act. The first section (17) lim-

its the indebtedness for any purpose whatever, and the second section (37) provides for the funding of the city debt, but adds this proviso: "provided, that the aggregate amount of said bonds, and all indebtedness and liability of the city, for any and all purposes, shall not at any time exceed the sum of $20,000." This proviso is a mere repetition of the preceding section, in substance, with the addition of the word "liability;" and, in effect, declares that the authority to fund shall not be construed to override the restriction of the indebtedness to the amount of $20,000. Hence, we may regard the latter section as a legislative construction of the former in this respect. If there was no other clause or section in the charter, restraining the powers of the council in matters like this, section 37 would be sufficient. It certainly was not put there to be meaningless.

In construing the section previously referred to in the constitution of that state, the supreme court of Illinois say: "In considering what construction shall be given to a constitution or a statute, we are to resort to the natural signification of the words employed, in the order and grammatical arrangement in which they are placed; and if, when thus regarded, the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the instrument, then such meaning is the only one we are at liberty to say was intended to be conveyed. There is no difficulty in ascertaining the natural signification of the words employed in the clause of the constitution under consideration, and to give them that meaning involves no absurdity or contradiction with other clauses of the constitution. The prohibition is against becoming indebted,— that is, voluntarily incurring a legal liability to pay, 'in any manner or for any purpose,' when a given amount of indebtedness has previously been incurred. It could hardly be probable that any two individuals of average intelligence could understand this language differently. It is clear and precise, and there is no reason to believe the con-

vention did not intend what the words convey. A debt, payable in the future, is obviously no less a debt than if payable presently; and a debt payable upon a contingency, as upon the happening of some event, such as the rendering of service or the delivery of property, etc., is some kind of a debt, and therefore within the prohibition. If a contract or undertaking contemplates, in any contingency, a liability to pay, when the contingency occurs the liability is absolute,— the debt exists,— and it differs from a present unqualified promise to pay only in a manner by which the indebtedness was incurred. And since the *purpose* of the debt is expressly excluded from consideration, it can make no difference whether the debt be for necessary current expenses, or for something else." *City of Springfield* v. *Edwards*, 84 Ill. 632, 633.

Then, it seems to be too clear for argument or further consideration, that, whether this contract be considered as a debt or a liability, it is prohibited by this section also of the city charter, and that, for that reason, it is beyond the authority of the city council to make it, or to attempt to carry it out in any particular.

But it is further contended by the respondents herein that the contract proposed to be made with Woolston is void, "because it is in violation of the charter provisions relative to advertising in case of contracts involving an expenditure of over $100." . The exact words of the charter provision referred to read as follows: "And in all contracts involving the expenditure of $100 or more, the city council shall advertise the same, with specifications, for a period to be prescribed by ordinance, and award the same to the lowest responsible bidder; and they shall so advertise all contracts when convenient so to do." Charter of Helena, p. 15. The only reasons given why the council should not comply with this requirement of the charter are that it is "not applicable to a plan for supplying a city with water, through a system of water-works, involving the use of the streets and hydrants;" and that "it is very apparent that this

provision of the charter only applies to cases where the city seeks to make some public improvement at its own expense." We do not see the force of these objections to this requirement of the charter. Certainly, the inapplicability does not appear from the reading of the charter itself. There is nothing in the nature of this contract which precludes the making of specifications. The size and number of miles of pipes and mains; the number of hydrants; the streets whereon the same are to be placed; the quantity of water; the number, force and size of the streams required to be thrown at one time; the capacity of the reservoirs, if any; and all other such particulars,— could be as well and as clearly stated in an advertisement as in the contract itself. Bidders could easily be notified that the contractor would be granted the privilege of using the streets, alleys and squares of the city for laying the pipes and mains required, and that all such property would be protected by appropriate ordinances of the city. It is just as easy and convenient to advertise for bids in a matter of this kind, as *it is in making preparations for building a house or a city hall.* Certainly it cannot be contended that a contract like this does not involve the expenditure of $100 or over. The amount due under this contract, if it should be made, would in three days, and every three days for twenty years, amount to at least $125. And again, if the provision of the charter in regard to advertising and letting to the lowest bidder does not apply to such a contract as this, the penal clause of the same section of the charter, providing for the punishment of the mayor and aldermen for being pecuniarily interested in a contract with the city, would not apply, and, for all that the charter says to the contrary, they might be corrupted with impunity. But we do not believe it was the intention of the legislature granting this charter to except contracts such as this from the operation of this section of that instrument. We cannot regard this provision of the charter as directory merely. The latter clause, relating to contracts involving the expenditure

of less than $100, being expressly left to the discretion of the council, shows that it was not intended to allow them any discretion in making contracts involving the expenditure of a greater sum. It is useless in the argument to put extreme cases. We have nothing to do with any other case than the one before us. If this restriction is not wise, it must be removed by the same power that imposed it; that is not the province of the courts.

The next objection raised to this ordinance or contract is that it is in violation of the act of congress passed the 10th of July, 1886. The fourth section of that act reads as follows: "That no political or municipal corporation, county or other subdivision in any of the territories of the United States shall ever become indebted in any manner or for any purpose to any amount in the aggregate, including existing indebtedness, exceeding four per centum on the value of the taxable property within such corporation, county or subdivision, to be ascertained by the last assessment for territorial and county taxes previous to the incurring of such indebtedness; and all bonds or obligations in excess of such amount, given by such corporations, shall be void; that nothing in this act contained shall be so construed as to affect the validity of any act of any territorial legislature heretofore enacted, or of any obligations existing or contracted thereunder, nor to preclude the issuing of bonds already contracted for, in pursuance of express provisions of law; nor to prevent any territorial legislature from legalizing the acts of any county, municipal corporation, or subdivision of any territory, as to any bonds heretofore issued or contracted to be issued." Pub. Act No. 159, Forty-ninth Congress, First Sess.

That, by entering into the contract proposed, the municipal corporation of the city of Helena would incur an indebtedness, within the meaning of the act of congress, we think has been sufficiently shown in the foregoing discussion and the authorities herein cited. The only question remaining to be settled is the amount of the indebtedness. The

last assessment fixes the taxable property within the corporation of Helena at $5,000,000. Four per cent. of this amount would be $200,000. The existing indebtedness of the city of Helena amounts to $34,500. This leaves a margin, under the act of congress, of $165,500. All this appears from the record in this case. It cannot be reasonably contended that the contract to pay $15,000 *per annum,* for twenty years, creates a debt of $300,000. One hundred and fifty thousand dollars placed at interest, at the rate of ten per cent. per annum, the legal rate in this territory, would yield $15,000 per annum, and have the capital left at the end of the term. A much less sum would purchase an annuity certain of $15,000 per year for twenty years, and this sum would be the real measure of indebtedness. No tables are accessible by which this sum can be exactly fixed, and time does not permit the calculation to be made; but it is quite evident that the amount would be much less than $140,000. Then, we see that this indebtedness cannot be considered as falling within the prohibition of the act of congress; and, if this were the only restriction, the injunction should properly have been dissolved.

But was the injunction improvidently or prematurely issued? It is said by the eminent counsel for Woolston herein that " it will be time enough to issue an injunction to prevent the city from paying for water when it has been furnished, and the council is threatening to do it." Let us see whether or not this is the case. An examination of the proposed contract itself will show. Section 25 of the proposed ordinance reads as follows:

" There is hereby appropriated out of the yearly revenues of the city of Helena, for the use and benefit of the said George F. Woolston, his successors or assigns, during the continuance of the franchise hereby granted, the following sums of money, viz.: Out of the general fund of the said city, the sum of $20 per year for each hydrant required by this ordinance to be kept and maintained by said George F. Woolston, his successors and assigns, on the thirteen and

one-half miles of mains provided for in this ordinance, for the use of the water through said hydrants by said city, for the purposes of sewerage; and the sum of $13 per year for each additional hydrant as herein provided for, for the same purposes. Out of the fire department fund of said city, the sum of $80 per year for each hydrant required by this ordinance to be kept and maintained by said George F. Woolston, his successors and assigns, on the said thirteen and one-half miles of mains provided for in this ordinance, for the use of the water through said hydrants by said city, for the purpose of extinguishing fires, and for the fire department, and the sum of $52 per year for each additional hydrant, as herein provided for, for the same purposes. And it is hereby made the duty of the city council of the said city, during the continuance of this ordinance, to levy annual taxes under the provisions of the charter of said city, authorizing the levy of taxes for general purposes and for fire department purposes, sufficient in amount to provide funds to meet the appropriation hereby made. For the purpose of carrying out the provisions of this section, the mayor and city clerk of said city are hereby required, without further provision, to draw warrants on the above funds for the above amounts, and to deliver the same unto the said George F. Woolston, or his successors or assigns. The first warrant shall be drawn and delivered, under this section, on the first day of the month after the works hereby contemplated have been in actual operation for one entire month, and have been accepted by the city council of said city; which warrants shall be for amounts which are in the same proportion to the amount of the yearly appropriation as the time the works have then been in operation is to one year. Thereafter, and on the first day of each and every succeeding month during the continuance of this ordinance, warrants for one-twelfth of the yearly appropriation shall be so drawn and delivered." Transcript, pp. 19, 20.

It is readily seen from an inspection of the foregoing

section of the ordinance that nothing remains to be done by the city council towards the issuance of the warrants. That as soon as " the works hereby contemplated have been in actual operation for one entire month, and have been accepted," " the mayor and city clerk of said city are hereby required, without further provision, to draw warrants on the above funds for the above amounts, and deliver the same unto the said George F. Woolston, or his successors or assigns." The time when the city council is " threatening to pay for the water" will never come in the future; it has already arrived; it is here. The danger is imminent. The work of construction may begin at any time, " not later than the 1st day of June, 1887;" and the " works shall be completed, and in readiness for the distribution of water, before the 31st day of December, 1887, unless unavoidably detained, and, in any event, by the 1st day of October, 1888." In a few months the contractor may have finished the water-works, and be knocking at the door of the city treasury, with his warrants in his hand. A mere ministerial act by the mayor and the city clerk, which will not take five minutes to complete, is all that remains to be done, on the part of the city, to unlock the treasury, and pour out the people's money. The city council have nothing more to do with the matter. They are not even required to make an order or levy a tax before the issuance of the warrants. Then, why is it necessary for the courts to delay longer, before putting forth the strong right arm of its equity power, armed with the writ of injunction?

In an Indiana case, wherein the city of New Albany entered into a contract with the G. F. A. T. Co. for their fire-alarm boxes, at a given price, Sackett enjoined the city council from carrying out the contract, on the ground that the indebtedness of the city had already exceeded the constitutional limit. The supreme court uses this language: " It is further insisted by the appellees that other remedies were open to the appellant; and, for that reason, if for no other, the facts alleged did not make a case for a restrain-

ing order against them.   In their assumption of that posi-
tion, the appellees are not supported by the authorities.
On the contrary, the weight of authority is overwhelmingly
against the position they thus seek to maintain.   In a case
like this, no other remedy would be so apt, comprehensive
and complete as a suit to restrain the municipal authorities
from transcending the limitations placed upon them by the
organic law of the state, and thus possibly involving em-
barrassing, if not harassing, complications.   Dill. Mun. Corp.
§ 914 *et seq.; City of New London* v. *Brainard,* 22 Conn.
552; *Webster* v. *Harwinton,* 32 Conn. 131; *Colton* v. *Han-
chett,* 13 Ill. 615; *Barr* v. *Deniston,* 19 N. H. 170; *Mayor,
etc.* v. *Gill,* 31 Md. 375; *Merrill* v. *Plainfield,* 45 N. H. 126;
*Roberts* v. *Mayor, etc.* 5 Abb. Pr. 41." *Sackett* v. *City of
New Albany,* 45 Amer. Rep. 473, also reported in 88 Ind.
473.   This law is laid down by Mr. High, in his work on
Injunctions, to the same effect.   He says: "The remedy by
interlocutory injunction being preventive in its nature, it
is not necessary that a wrong should have been actually
committed before a court of equity will interfere, since, if
this were required, it would, in most cases, defeat the very
purpose for which the relief is sought, by allowing the
commission of the act which complainant seeks to restrain;
and satisfactory proof that defendants threaten the com-
mission of a wrong which is within their power is sufficient
ground to justify the interference."   High, Inj. § 31.

These principles, laid down by the text-writers, and ap-
proved by the courts, are not by any means novel.   More
than fifty years ago the supreme court of Ohio took occa-
sion to announce this doctrine.   In a case where a party
was "threatening" to cut a mill-race through the plaintiff's
land, without his consent, in order to convey the water to
the mill of defendant, an injunction was sought for and
granted, and a motion to dissolve was made on the ground
that the writ was granted prematurely, and that the land
was of very little value, and that many things remained to
be done before the defendants would be ready to begin

operations. In deciding that the motion to dissolve the injunction should be overruled, the supreme court, through Judge Collet, delivering the opinion, say: "It is contended that the bill should have stated that the release to the state had been executed, and that the canal commissioners had commenced the weir or race, or that preparations were made for its commencement; that the statement that they '*threatened*' to construct the weir and race is not sufficient to authorize the injunction. An injunction prohibits the doing something which could injure or endanger the rights of the complainant, as the causing nuisances, or committing trespass of certain kinds, or the assignment of a note, or the payment of money. If the court had evidence that the defendant intended to commit the wrong, before its commencement, and that he had the power to do it, they could no more refuse the writ to prevent its commencement than, after its commencement, to stop its progress. Why should the court? There are many cases in which, if the court could not issue the writ until the wrong was commenced, it would be of no avail; as to prevent the assignment of a note, opening of a mill-dam, or taking down a house. And in this case, the canal commissioners, with the force in their employ, might not allow sufficient time, after the commencement of the work, until it was finished, to have an injunction applied for, allowed and served, before its completion. The bill states that the defendants '*threaten*' to dig this race, which is confessed by the demurrer. On proof of the defendants threatening to do the wrong, when it appears they have the power, the court issues this writ." *McArthur* v. *Kelly*, 5 Ohio, 154, 155.

But we find there are other authorities more directly in point to sustain the issuance of this writ of injunction. Because the cases referred to are not accessible, we must quote from the text-writers: "When an act, about to be committed by a municipal corporation, is clearly illegal, and its necessary effect will be to impose heavy burdens upon the property of citizens and tax payers, a court of equity is

warranted in interfering by injunction for the prevention
of such act. In such case, a more prompt and efficacious
remedy is demanded than is afforded by the tardy action
of courts of law, and equity alone can administer the nec-
essary relief, by the exercise of its extraordinary power by
injunction." High, Inj. § 784. "The rule may be broadly
stated, that courts of equity have undoubted jurisdiction to
interfere by injunction when the corporate authorities of a
city are taking improper or illegal proceedings, under claim
of right, to do an act injurious to the rights of citizens and
property holders." High, Inj. § 793.

It is useless to multiply authorities, or further discuss this
question. From the authorities, and the facts and circum-
stances of this case, it is clear to our minds that this injunc-
tion was neither improvidently nor prematurely issued.

There being no error in the judgment of the court below
in overruling the motion to dissolve this injunction, the same
is hereby affirmed.

*Judgment affirmed.*

GALBRAITH, J., concurs.

BACH, J. (*dissenting*). I cannot agree with the majority
of the court upon the decision of this cause. I am of the
opinion that the restraining order, in some respects, is abso-
lutely useless; in others, that it is upon the face of the facts
stated in the motion papers, premature; and that, therefore,
it should have been vacated. In that view of the case, I
feel that it is ill advised to consider whether or not the
ordinance, in any of its sections, is void. The decision of
a court that an ordinance or a law is void is one upon a
grave and important subject. It should not be rendered
when not necessary; when made, it should be final. It
should be well considered.

The ordinance which, by the majority of the court, upon
a preliminary matter, is declared to be null and void, at
least in part, was passed by the legal authorities, for the
purpose of providing sufficient water for the health and

safety of the inhabitants of the first city of the territory. There is no question — no doubt — of the benefits to be derived by the inhabitants of Helena from the provisions of that ordinance. There is no question of fraud. There is the one question, "Had the city officials the power to grant this great benefit to the inhabitants of Helena?" For all that we know, there may be no water furnished at present to that city, either for houshold purposes or for protection against fire; or the present supply, if we must know there is one, may be inadequate. At any rate there can be no presumptions against the defendants. The presumptions are that the defendants were acting in the discharge of their duties. Until this case can be finally heard and determined, the people of Helena will be deprived of this great blessing; the prosecution of a great project will be hindered and delayed, perhaps, only in the end to find that the delay was improperly enforced; all of which is done — *First*, because it is claimed that a monopoly is given to the defendant Woolston, although, as far as appears, neither the plaintiffs nor any one else wish to sell water to the city; *second*, because warrants may be issued at some future time, which warrants, plaintiffs claim, and the majority of the court hold, are void; and consequently, from such claim of the plaintiffs and decision of the court, they are warrants which cannot be paid to the injury of the plaintiffs or any one else.

I repeat that I shall not pass upon the validity of any or all of the sections of the ordinance, except in so far as they are necessarily involved in the position which I assume, that the order of injunction was premature. I am not to be considered as agreeing with or dissenting from the majority of the court upon any proposition not thus directly involved. I have no doubt that the plaintiffs had the right to commence this action. They are tax payers, and, in so far as the contract portions of the ordinance are concerned, the plaintiffs are directly and personally interested; but, in so far as the license part of the ordinance is concerned,—

the naked license of laying pipes,— I think the plaintiffs are not proper parties, there being no charge of fraud, or that the city council is disposing of a franchise in a manner illegal, except as to the contract part. All the cases which I can find hold that distinction. *Crampton* v. *Zabriskie*, 101 U. S. 601, 609, is authority upon the first proposition. Upon the second proposition, it is enough to cite the general principle that an injunction will not be issued to restrain a fancied injury. There must be some act definite and impending, threatening to inflict some irremediable wrong upon the plaintiffs, or the plaintiffs must show an injury to them, special, and not an injury general in its nature, before a court of equity will interfere. If Woolston, by laying his pipes, injures the plaintiffs, they must show some special injury to themselves, or they must sue in their own behalf, and in behalf of the people of Helena.

In considering the subject, we may divide the persons enjoined into three classes: (1) The defendant Woolston; (2) The city council, composed of the mayor and the defendants who are aldermen; and (3) the mayor and the clerk of the city of Helena.

1. Woolston is not a party to the appeal. He need not be considered; and any right that he may have could not be noticed except in so far as those rights are involved in the terms of the order restraining the other parties defendant.

2. The city council, which, by the terms of the charter, is composed of the mayor and the aldermen. They have passed the bill; no restraining order can affect the passage of the bill. Now, under this ordinance, what are the duties of the council? and, in discharging those duties, how does the council threaten some definite, certain, irremediable wrong to the plaintiffs, which entitles the plaintiffs to an order restraining the council from discharging those duties? Let us briefly consider the terms of the ordinance, so far as they concern the council. Section 18 provides: "The right is hereby reserved to the city to govern, by ordinances to

be enacted from time to time, the general use of the said city hydrants, and the control and care thereof, for the purposes in this ordinance mentioned." There does not seem to be any great wrong threatened to the plaintiffs in that section,—any definite, irremediable wrong. Section 19 provides, as far as the city council is concerned, that "it shall at all times have, and they hereby reserve the right, in case said Woolston, or his successors or assigns, fail to keep said hydrants in good repair, to repair the same, and deduct the cost thereof out of the first warrants to be issued to him or them after such repairs have been made."

The bill provides that the mayor and city clerk shall issue any warrants due thereunder, the aldermen having nothing to do with that. The section just read provides — *First*, that in certain cases the council may repair the hydrants. Certainly the plaintiffs cannot suffer any great irremediable wrong there. *Second.* In case of such repair, the aldermen are authorized to deduct the cost thereof; that is, to pay out less money. I cannot see any great wrong to the plaintiffs in the act of deducting an amount of money from a warrant over which the aldermen have no other power; the act would seem to protect the plaintiffs *pro tanto.* Section 21 provides: "The mayor and committee of the city council of said city, and any officer or other person authorized by said council, shall at all times have free access to the entire works and system contemplated by this ordinance, for the purpose of inspecting, examining or testing the same, or any part or portion thereof." There is no evident wrong to the plaintiffs in any future act under that section. Section 23 provides that, if Woolston fails to comply with the terms of the bill, the city may repeal, modify or amend the ordinance in certain respects. There is no injury to the plaintiffs in that. Section 24 provides for an examination by the city council of the system and works; for the acceptance by the council, if the work is approved; and for the tests which shall be applied. It is certainly the interest of the plaintiffs to have good works,

if any. The mere examination, approval and acceptance cannot, *per se*, injure the plaintiffs, provided the acceptance does not bind the city to the injury of the plaintiffs. It is a proper provision to see that the franchise is not given in vain. Sections 3, 6, 7, 20, contain provisions of a like nature. There is one more — one other provision — relating to the levy of an annual tax. It is contained in section 25, and will be considered hereafter in connection with the powers of the mayor. These are all the powers given to the council by this ordinance. Section 25 is the only one which can affect the rights of plaintiffs adversely, and will be considered by itself in connection with the mayor. This brings up for consideration an important question,— one that is involved in the terms of the restraining order, in so far as that order applies to the council, acting under any and all of the sections before referred to, excepting section 25.

It will be observed, upon a careful examination of the ordinance, that section 1 grants the defendant Woolston the right to lay water-pipes, for the purpose of furnishing water " to all persons, bodies or corporations within the city desiring to purchase the same; " and the section provides that he shall not have the exclusive right so to do. The council certainly has right and power — nay, it is the duty of that body — to provide the people of the city of Helena with water. See the charter of the city of Helena. Section 1, then, gives that license. Section 2 is supplementary to section 1, giving power to dig the ditches necessary, and providing that the streets shall be restored to their former condition. Section 3 provides for the amount and quality of the water. Section 4 provides for the amount of pressure in the pipes. Section 5 provides the number of miles of mains which must be located, and the diameter of the pipes in the various quarters. Section 6 provides the number of hydrants, and nature thereof. Section 7 provides for the laying of pipes in the future, when Woolston shall be directed so to do. Section 8 pro-

vides that the pipes shall be laid at a certain depth, and that they shall be laid under the supervision of the street commissioner. Section 9 provides that the pipes so laid shall not interfere with other mains or pipes, and that water-pipes shall be separated by at least six inches of dirt from all gas-pipes. Section 10 provides that no water shall be conveyed through wooden conduits or open ditches; that the mains and pipes shall be first class, and shall stand a certain pressure. Section 11 provides that Woolston and his successors shall provide to the city of Helena, free from cost, all water which may be required by that city for the use of any and all buildings owned or occupied by said city for municipal purposes, and for sprinkling or irrigating the streets. Section 12 provides that Woolston shall receive no pay from the city, or from any person, body or corporation, for any time during which water is not furnished on account of unavoidable accidents. Section 13 provides that the works shall be constructed and maintained so as to interfere as little as possible with the rights and property of others, and that Woolston shall pay for all damages resulting from erection, etc., of the works. Section 14 specifies the time before which the work shall be commenced, and the time within which it shall be completed. Section 15 provides the charges for water furnished to any person, body or corporation in the city of Helena. Section 16 provides that Woolston shall make no charges for tapping mains for the connection of service pipes therewith; provides for the making of that connection; and also that permits must be had from Woolston, and that service pipes must be at a certain depth. Section 17 provides the means whereby Woolston may refuse to deliver water,— when water-rates are not paid, after they shall have become due. Section 18 has been referred to. Section 19 provides that the city shall have full power to use any of the hydrants for fire, sewer, and other purposes, and that the city shall have the right to repair said hydrants. (This part of the section has been mentioned before in this opinion.) Section

20 refers to the right of the city to grant charters to other persons to distribute water. Thus, again, the monopoly theory is defeated, as far as the license is concerned. In this section occurs the first reference of any right in Woolston to furnish the city with water. In all former sections, where mentioned at all, it is a duty imposed upon Woolston, and a right to demand upon the part of the city. Section 21 has been before mentioned. It gives the city power to examine and test the works. Section 22 reserves all rights to have service pipes disconnected in case of fire. Section 23 we have considered. It provides for the repeal and modification of the ordinance in case Woolston fails to comply with the terms thereof, providing that this shall not prevent Woolston from keeping the pipes and furnishing water to the inhabitants. Section 24 we have considered. It provides for the acceptance of the works. Section 25 contains a contract between the city and Woolston, and the consideration, the money to be paid, and the means of raising the same. Section 26 provides that no person, unless authorized by Woolston or the city council, shall disturb or interfere with the machinery, etc., or shall pollute the water. Section 27 provides that no one shall attempt to hold possession of a hydrant, or refuse to give up a key to a hydrant in case of fire. Section 28 provides for the fine or imprisonment of any person violating the ordinance. Section 29 provides that the word "streets," when used in the ordinance, shall be deemed to mean alleys, etc. Section 30 provides that no provision of the ordinance respecting size of mains and pressure shall be construed to release Woolston from furnishing a full supply of water to the city and inhabitants thereof. Section 31 declares the intent of the ordinance to be to provide the city and inhabitants with water. Section 32 provides that Woolston must accept of the terms of the ordinance, and also provides for a bond to be filed by him. Those sections comprise the ordinance. I believe that the substance of the original sec-

tions is fairly comprised within the above digest or recital thereof.

I have quoted fully, so that the point which I wish to make may be clear. It is apparent from an examination thereof, that these thirty-two sections may and can be divided into four groups. First group: Sections 1 and 2 give a license to Woolston to lay pipes and to furnish water to any one within the city limits. Second group: Sections 3 to 18, both inclusive, section 21, sections 26, 27, 28, 29, and 32, relate exclusively to the manner of laying the pipes, the pressure, the quality of the water, the bonds to be filed, and the protection of the works when built. Groups 1 and 2 of these sections relate entirely to the license. Third group: This includes all sections not already mentioned, except section 25. This group relates, by mere inference, to the contract, but directly to the same subject as those in the second group. It is composed of sections 19, 20, 22, 23, 24, 30, and 31. By a reference to these sections, or digest thereof hereinbefore set out, it will be seen that those sections neither separately nor collectively could be used to enforce any liability against the city; that all that can be said of those sections, in that respect, is that the city has the right to use the water; and that, if it did so use the water, there would be an implied contract, but not one contained in those sections, that the city would pay a reasonable value for the water so used. Fourth group: This is section 25, which contains all the terms of the contract upon the part of the city, and which alone creates any obligation upon the city to pay any money, or do anything whatever, which could in any way injure the plaintiffs.

Whatever name we may choose to apply to these provisions, whether we shall call any or all of them legislative or business functions of the city council, it is nevertheless apparent that the sections creating the license granting the franchise are perfectly independent of all other sections of the ordinance. That being the case, they should not be de-

clared void because other sections creating the contract are invalid. See *Packet Co.* v. *Keokuk*, 95 U. S. 80. In that case, the city of Keokuk, by virtue of a law of Iowa in the charter of that city, passed a certain law relative to wharfage. The different sections of the ordinance contained separate and distinct items of wharfage; but one section, No. 3, provided different wharfage charges for steamboats. The plaintiff sought to be relieved from the payment of one of these items imposed upon it by the city. Different extracts from the opinion of the court will show the ruling upon this point. The court say: "In nothing that we have said do we mean to be understood as affirming that a city can, by ordinance or otherwise, charge or collect wharfage for merely entering its port or stopping therein, or for the use of that which is not a wharf, but merely the natural and unimproved shore of a navigable river. Such a question does not arise in this case. . . . The city of Keokuk has imposed no charge upon these plaintiffs which it was beyond the power of the city to impose. To the extent to which they are affected, there is no valid objection to it. Statutes that are constitutional in part, only, will be upheld, so far as they are not in conflict with the constitution, provided the allowed and prohibited parts are severable. We think, as severance is possible in this case, it may be conceded the ordinance is too broad, and that some of its provisions are unwarranted. When those questions are attempted to be enforced, a different question may be presented."

It will be observed that the court was considering a city ordinance; so are we. It will be further observed that the provision which was held valid, and the provisions of which the court say " it may be conceded . . . that some of its provisions are unwarranted," are in one and the same section. Even so they were held severable. In the ordinance which we are considering, the parts which are objectionable as a contract, and the parts granting the license, are sections separate and apart from each other. The au-

thority is conclusive. See, also, *Lane* v. *Commissioners of Missoula Co. ante,* p. 473 (decided at this term of court, and in which the opinion of the court was written by the learned justice writing the opinion of the majority of the court in this case). Conceding this,—admitting that the sections are severable,—we find the city council doing not only what they had the right, but what it was their duty to do. If there was no water furnished to the city, the council should provide the city with water. If there was water furnished, the granting of a further license was a benefit to the city. It instituted a competition which tends to cheapen water rates. It took from that former company, if there was such a one, the monopoly which that company has had,— a monopoly of which plaintiffs complain so bitterly, as tax payers. As tax payers, the plaintiffs should not complain of a competition between water companies which tends to lessen water rates. As tax payers, the plaintiffs should welcome the destruction of the monopoly held by any former water company, if there was such a one. Upon that question, the former water company is the only one that can have cause to complain; and that company, if there is such an one, is not a party to this action.

It is clear to me that the order should be modified, at least so far as the license, and all things connected therewith, are concerned. Upon this I differ from the conclusion reached by a majority of the court. They do not deny that the sections are severable; but they claim that this part of the injunction is not before us. This they claim because, the defendant Woolston not having been served with summons or order restraining him from using the license, neither he nor those acting only upon the part relating to the license are affected. This is open to two objections: Either the order is useless as to the aldermen, or it restrains them from doing something which is a prerequisite to the rights granted under the license. For it must be remembered that the aldermen have nothing to do with the issuing of the warrants. That is confined by section 25 to the

mayor and city clerk.    All that is left for the aldermen to do is to accept the work.    If the order is useless as to them, then it should be modified as to them.    What is known as the "right arm" of equity should not be called upon to strike a useless blow.    If the order attempts to restrain the council as to the passage of the ordinance it is too late; but if the order, as it does, restrains the council, including the mayor, from doing anything which is a prerequisite to the license, then it materially affects those portions of the ordinance which I claim, and which the majority of the court do not deny, are valid; and in that respect, at least, the order should be modified.    The order restrains the council and mayor from discharging duties beneficial to the city, in that, Woolston being restrained, he can lay his pipes without any examination by the agents of the city.

Section 8 of the ordinance provides that the work of laying the mains shall be done under the supervision of the street commissioner.    He is an agent of the municipal authorities; and the order restrains him from doing that which is part of the terms of the license, and which is no part of the contract.    Section 24 provides for the examination and acceptance of the work.    This is not a portion of the contract, but is one of the conditions that must be complied with before the inhabitants of the city can have the water.    It is a beneficial provision, one to be exercised by the council, and one which the council should not be restrained from complying with, because it relates only to the license portion of the ordinance.    Finally, section 32 provides for the filing of a bond, as one of the prerequisites. That bond is to be filed with the city clerk, and is to be approved by the mayor.    The order, in so many words, restrains the city clerk from accepting, and the mayor from approving, any such bond.    Those acts refer to that which concerns the license only, and the order restraining those acts should be modified, at least in respect to them.

To put the question briefly: (1) The statute can be divided into two parts; one consisting of those sections which

grant the license and control its use, the other those sec-
tions which create the contract. The two parts are not so
commingled that they cannot be readily distinguished.
This being the case, and there being no illegality in the
license portion, the sections referring to the license should
be held valid. Cases already cited. (2) The mayor, indi-
vidually, the council, composed of the mayor and aldermen,
and the city clerk are restrained from doing certain acts
which they must perform before the city can have the bene-
fit of this valid license. These acts are for the benefit of
the city, and are in no way connected with the contract.
Therefore, the injunction should be modified in that respect
at least.

As to that section of the ordinance which relates to the
contract, I think that the question of monopoly can well
wait until the final hearing of this cause. The plaintiffs are
not a water company, wishing to furnish water to the city;
they come here as tax payers, and as such, I can see no great
wrong threatening them as far as the monopoly in that sec-
tion is concerned.

It remains only to consider that portion of the ordinance
relating to the issuance of warrants. This court takes judi-
cial notice of the seasons of the year, of the climate of
Helena, and of the terms of the district court. The order
was granted on December 4, 1886. The court judicially
knows that it will be some months before Woolston can
commence to lay mains or pipes. We also know that it
takes some time to lay thirteen miles of mains. The ordi-
nance directs that the first warrant issued thereunder shall
not be issued until the works shall have been in operation one
entire month (see sec. 25), and we judicially know that there
will be a term of the district court, at which this question
can be determined, within three months. In view of these
facts, I think the issuance of the temporary order was use-
less, and should therefore be vacated, for no injury to the
plaintiffs can happen in the meantime, and Woolston can
claim no right under that section by proceeding with his

work; for if that section is void, he is presumed to know the law in that respect. I can see no great, impending, immediate, or irreparable injury to the plaintiffs from this section of the ordinance. The treasurer of the city of Helena pays warrants duly issued; he alone can make payments. If the warrants are void, then the treasurer should not pay them. The warrants cannot be issued until one month after the water-works have been in operation. Before that time, as we have seen, this action can be heard upon its merits. At any event, plaintiffs can bring an action to restrain the treasurer from paying those warrants. Before they will have to bring an action against the treasurer, in order to protect themselves, many of the uncertainties which ought to prevent them from maintaining the preliminary injunction in this case will have disappeared. Until Woolston has filed his consent and bond; before the work is so completed; before any warrants are issued,— plaintiffs can suffer no wrong; but after all of these things shall have been done, plaintiffs will still have a month in which to commence an action to restrain the treasurer from paying the warrants. At that time, when all those uncertainties shall have vanished, plaintiffs can come into a court of equity and show that they are threatened with some definite, certain, imminent and impending danger. Until that time comes, the danger is fanciful; it is theoretical, problematical, and dependent upon too many contingencies, and a court of equity, to protect them against such injury as that, cannot and should not exert the great power of injunction intrusted to it. It would be belittling the highest power given to courts to use it in fighting windmills of that description. Upon the general principles above stated, relating to the definiteness and imminency of the danger against which equity will protect those seeking its protection, I cite the following cases: *Spring Valley Water-works* v. *Bartlett,* 16 Fed. Rep. 615, and cases cited; *Morgan* v. *City of Binghampton,* 102 N. Y. 500; *People* v. *Canal Board,* 55 N. Y. 391; *Kearney* v. *Andrews,* 10 N. J. Eq. 70–78, and

many cases in California holding that courts of equity will not grant relief against a judgment void on its face.

The case of *Crampton* v. *Zabriskie*, 101 U.S. 601, is much relied upon by respondents. The opinion in that case was written by Mr. Justice Field, who, as a justice of the supreme court of California, established for that state, and maintained in many authorities, the principle that equity will not restrain a fanciful injury which is based upon a void act. In the United States case the learned justice was dealing with no such fanciful wrong. Crampton had brought action against a city to compel it to pay certain bonds issued by the city. The bonds had been declared invalid before Crampton brought the action referred to. Zabriskie brought an action to restrain the prosecution by Crampton of that action. There was no fanciful wrong there; payment of the bonds was threatened. So, with the case at bar, when the warrants shall have been issued and payment threatened, there will be an injury threatening, against which plaintiffs can be protected in a court of equity.

I am therefore of the opinion that the judgment of the court below, overruling the motion to dissolve the temporary injunction, should be reversed.